## NEAL *v.* DELAWARE.

1. The adoption of the Fifteenth Amendment rendered inoperative a provision in the then existing Constitution of a State, whereby the right of suffrage was limited to the white race.
2. Therefore, a statute confining the selection of jurors to persons possessing the qualifications of electors is enlarged in its operation so as to embrace all those who, by the Constitution of the State, as modified by that amendment, are entitled to vote.
3. The presumption should be indulged, in the first instance, that the State recognizes as binding on all her citizens and every department of her government an amendment to the Constitution of the United States, from the time of its adoption, and her duty to enforce it, within her limits, without reference to any inconsistent provisions in her own Constitution or statutes.
4. In this case, that presumption is strengthened and becomes conclusive, not only by the direct adjudication of the highest court of the State of Delaware that her Constitution had been modified by force of the amendments to the Constitution of the United States, but by the entire absence of any statutory enactment, since their adoption, indicating that she does not recognize, in the fullest legal sense, their effect upon her Constitution and laws. Where, therefore, a negro, indicted in one of her courts for a felony, presented a petition alleging that persons of African descent were, by reason of their race and color, excluded by those laws from service on juries, and praying that the prosecution against him be removed to the Circuit Court of the United States, — *Held*, that the prayer of the petition was properly denied.
5. Had the State, since the adoption of the Fourteenth Amendment, enacted any statute in conflict with its provisions, or had her judicial tribunals repudiated it as a part of the supreme law of the land, or declared that the acts passed to enforce it were inoperative and void, there would have been just ground to hold that the case was one embraced by sect. 641 of the Revised Statutes, and, therefore, removable into the Circuit Court.
6. The exclusion, because of their race and color, of citizens of African descent from the grand jury that found, and from the petit jury that was summoned to try, the indictment, if made by the jury commissioners, without authority derived from the Constitution and laws of the State, was a violation of the prisoner's rights, under the Constitution and laws of the United States, which the trial court was bound to redress; and the remedy for any failure in that respect is ultimately in this court upon writ of error.
7. Upon the showing made by the prisoner, the motions to quash the indictment and the panels of jurors should have been sustained.
8. The court reaffirms the doctrines announced in *Strauder* v. *West Virginia* (100 U. S. 303), *Virginia* v. *Rives* (id. 313), and *Ex parte Virginia* (id. 339).

ERROR to the Court of Oyer and Terminer of New Castle County, State of Delaware.

The plaintiff in error, a citizen of African descent, was, on May 11, 1880, indicted in the Court of General Sessions of the Peace and Jail Delivery of New Castle County, Delaware, for the crime of rape, — an offence punishable, under the laws of that State, with death.   The indictment was, by a writ of *certiorari,* removed for trial into the Court of Oyer and Terminer for the same county, the highest judicial tribunal of Delaware in which the decision of such a case could be had.   In the latter court, the accused, by counsel specially assigned for his defence, filed the following petition : —

"In the Court of Oyer and Terminer of the State of Delaware, sitting in and for New Castle County.   May Term, A.D. 1880.

"THE STATE OF DELAWARE ⎱
            *v.*                      ⎰
    WILLIAM NEAL.

"Indictment for Rape, certified from the Court of General Sessions for said County.

"To the Honorable Court of Oyer and Terminer of the State of Delaware, sitting in and for New Castle County.

"The petition of William Neal respectfully represents that your petitioner is the defendant in the above-entitled indictment for the crime of rape alleged to have been committed on one Margaret E. Gosser; that said indictment was found in the Court of General Sessions of the Peace and Jail Delivery for said county, by the grand inquest of said county, on the eleventh day of May instant, and has since been duly certified into the Court of Oyer and Terminer for said county.

"That your petitioner is a citizen of the United States and of the State of Delaware, of African race and descent, and black in color; that, by the statutes of the State, all persons qualified to vote at the general election are liable to serve as jurors, except public officers of the said State or of the United States, counsellors and attorneys at law, ordained ministers of the gospel, officers of colleges and teachers in public schools, practising physicians, surgeons regularly licensed, cashiers of incorporated banks, and all persons who are more than seventy years of age.

"That by the Constitution of the State, the right of an elector is enjoyed only by male citizens above the age of twenty-one years, who are also free white persons, and is not enjoyed by virtue of the

provisions of that Constitution, by persons otherwise qualified, who are not white persons.

"That the Levy Court of New Castle County are required by the law of the State, at its annual session in March, to select from the list of taxable citizens of each county the names of one hundred sober and judicious persons to serve, if summoned, as grand jurors at the several courts to be holden in that year; and also the names of one hundred and fifty other sober and judicious persons to serve, if summoned, as petit jurors in said courts; that said Levy Court for said county, at their annual session in March last, in selecting persons to serve as grand jurors and petit jurors as aforesaid, if summoned, for the courts aforesaid, including both the Court of General Sessions and the Court of Oyer and Terminer, as aforesaid, selected no persons of color, or African race, to serve as such jurors as aforesaid; but, on the contrary thereof, did exclude all colored persons and persons of African race, because of their race and color, from those selected as aforesaid to serve as and be drawn for jurors as aforesaid; that the prothonotary and clerk of the peace for said county drew from the lists of those so selected as aforesaid to serve as grand jurors the grand jurors by whom the said indictment against your petitioner was found, and also drew from the list of those selected as aforesaid to serve as petit jurors the petit jurors by whom your petitioner is to be tried for his life under said indictment, and that from both the grand jury aforesaid and from the said petit jury all persons otherwise qualified by law to serve as jurors as aforesaid who were persons of color and of African race, were excluded as aforesaid, because of their race and color, from serving thereon as jurors, and that said grand and petit juries were drawn from and composed of exclusively white persons, and that, in fact, persons of color and of African race, though otherwise qualified, have always in said county and State been excluded from serving on juries because of their race and color; that by reason of the exclusion as aforesaid from said grand and petit juries in said courts of all persons of color and African race, because of their race and color, though otherwise qualified to serve as jurors, your petitioner, in the finding of said indictment, has been, and in the trial thereof will be, denied the equal protection of the laws; and will not have the full and equal benefit of all laws and proceedings in the State of Delaware for the security of his person in the trial of said indictment as is enjoyed by white persons.

"That by reason of the exclusion as aforesaid of all persons of color and African race from said grand and petit juries in said courts,

and by reason of the Constitution and laws of Delaware in respect to the qualifications of jurors excluding from said grand and petit jury all colored persons of African race, your petitioner is denied, and cannot enforce in the judicial tribunals of the State, a right secured to him by the law of the United States providing for the equal civil rights of citizens of the United States, to wit, the rights under the fourteenth article of the amendments to the Constitution of the United States to the equal protection of the laws; and to the right under said amendment and the acts of Congress in the enforcement thereof to a trial under said indictment for his life by a jury from which the State of Delaware has not excluded all persons of his own race and color because of their race and color.

"Your petitioner therefore prays this honorable court that the said indictment and its prosecution be removed into the Circuit Court of the United States for the District of Delaware for trial at the next ensuing term of said Circuit Court.

"And your petitioner will ever pray.

his<br>" WILLIAM + NEAL.<br>mark.

"Sworn to and subscribed by the said William Neal, the thirteenth day of May, A.D. 1880, before me.

JOHN P. SPRINGER, C. P.

" STATE OF DELAWARE,
          " New Castle County, ss :

"On this fourteenth day of May, A.D. 1880, before me, John P. Springer, clerk of the peace and of the Court of Oyer and Terminer and the Court of General Sessions of the Peace and Jail Delivery for New Castle County, personally appeared William Neal, who, being by me first solemnly sworn according to law, says that the facts set forth in the foregoing petition (signed by him by making his mark thereunto in my presence) are true to the best of his knowledge and belief.

his<br>WILLIAM + NEAL.<br>mark.

"Sworn to and subscribed before me, as witness my hand and the seal of the Court of Oyer and Terminer the day and year aforesaid.

"JOHN P. SPRINGER, C. P."

The court being of the opinion that the defendant was not entitled to have his case removed to the Circuit Court of the

United States, because there is no law of the State of Delaware forbidding the Levy Court to select persons of African race and of color as jurors, on account of their race and color, if in the judgment of the Levy Court such persons are otherwise qualified to serve as jurors; and because it did not appear that the grand and the petit jury, though composed solely of white men, were so made up because the names of colored men were not selected for jury service on the ground of their race and color; and because the defendant had not shown that he was denied any right secured to him as a citizen of the United States, through the selection of those panels by the Levy Court, — denied the prayer of the petitioner, and refused to certify the indictment and prosecution into the Circuit Court, but compelled him to proceed to trial in the Court of Oyer and Terminer. To which ruling of the court the defendant excepted.

Thereupon the defendant, before he was arraigned, moved to quash the indictment, and the list and panel of grand jurors by whom it was found, upon the following grounds: that the Levy Court, in selecting persons to serve as grand jurors and petit jurors (if summoned) for the Court of General Sessions and the Court of Oyer and Terminer, selected no persons of color or African race to serve as such jurors, but, on the contrary, excluded all colored persons and persons of African race, because of their race and color, from those selected to serve as and be drawn for jurors; that the prothonotary and clerk of the peace for the county drew from the lists of those so selected to serve as grand jurors the grand jurors by whom the indictment against the defendant was found, and also drew from the list of those selected to serve as petit jurors the petit jurors by whom the defendant was to be tried for his life under the indictment; and that from both the grand and the petit jury all persons qualified by law to serve as jurors who were persons of color and of African race were excluded, because of their race and color, from serving thereon as jurors, and that the grand and petit jurors were drawn from and were composed exclusively of white persons, and that, in fact, persons of color and of African race, though otherwise qualified, have always in the county and State been excluded from serving upon juries because of their race and color; and that by reason of such exclusion

from the grand and petit juries of all persons of color and African race, because of their race and color, though otherwise qualified to serve as jurors, the defendant in the finding of the indictment had been, and in the trial thereof would be, denied the equal protection of the laws, and would not have the full and equal benefit of all laws and proceedings in the State of Delaware for the security of his person as is enjoyed by white persons.

It being then and there agreed between the attorney-general on behalf of the State, and the defendant, through his counsel, with the consent of the court, that the statements and allegations of the defendant in his petition for the removal of the indictment, and its prosecution for trial into the Circuit Court and their verification by his oath, should be taken and treated and given the same force and effect, in the consideration and decision of the motions to quash the indictment, and the lists and panels of grand and petit jurors, as if the statements and allegations were made and verified by him in a separate and distinct affidavit; the court thereupon overruled and refused to grant the motion of the defendant to quash the indictment, and the lists and panels of grand jurors and petit jurors, because although in fact no persons of African race and of color were upon either panel no evidence had been produced or offered by him to prove his statements and allegations in his petition and affidavit thereto, upon which the motion to quash was founded, that the exclusion by the Levy Court from the grand and petit juries of all persons of African race and color was because of their race and color, and that the court could not accept such fact of exclusion because of race and color to be established by the circumstance that no persons of African race or of color were, in fact, on the lists and panels of grand jurors and petit jurors, or by his mere unaided affidavit, but the same should have been proven affirmatively on his part by competent testimony outside of his own affidavit, before the motion could be granted. To which ruling the defendant excepted.

Thereupon, before the defendant was arraigned under the indictment, and before he had pleaded thereto, and after the motion of the defendant to quash the indictment and the lists

and panels of grand jurors and petit jurors, because of the alleged exclusion by the Levy Court of New Castle County from the lists and panels of grand jurors and petit jurors of all persons of African race and color, because of their race and color, had been overruled by the court, because the defendant had offered no evidence or witnesses to prove the statements and allegations of his own affidavit that the Levy Court had excluded from the lists and panels of grand jurors and petit jurors all persons of African race and of color, because of their race and color, to wit, on the twenty-fourth day of May, 1880, he further moved the court that he be permitted to produce as witnesses in support of his motion to quash the indictment, and the lists and panels of grand jurors and petit jurors, and in support of the allegations and statements of his petition and affidavit, on which the motion was founded, the commissioners and clerk and bailiff of the Levy Court, and that the court should issue by its clerk subpœnas for the persons as witnesses to testify as aforesaid.

The court overruled the motion, and refused to cause sub pœnas to be issued for the witnesses and to permit the defendant to produce them, or to go into the proof of the statements and allegations of his petition and affidavit on which the motion to quash was founded on the ground that full time to produce the witnesses had existed before the motions were heard ; that application for leave to summon witnesses to support a motion which had been argued and refused because of want of proof when sufficient time had existed for its production was without precedent in the Court of Oyer and Terminer of that State, and therefore the motion must be treated as coming too late to be granted ; to which ruling of the court the defendant excepted.

The prisoner was then arraigned, and pleaded not guilty. The jury tried the issue, and returned a verdict of guilty. Whereupon he was by the court, May 27, 1880, sentenced to suffer death by hanging. He thereupon sued out this writ of error.

Sect. 1 of art. 4 of the Constitution of Delaware declares that —

" All elections for governor, senators, representatives, sheriffs, and coroners shall be held on the Tuesday next after the first Monday

in the month of November of the year in which they are to be held, and be by ballot.

"And in such elections every free white male citizen of the age of twenty-two years or upwards, having resided in the State one year next before the election, and the last month thereof in the county where he offers to vote, and having within two years next before the election paid a county tax, which shall have been assessed at least six months before the election, shall enjoy the right of an elector; and every free white male citizen of the age of twenty-one years and under the age of twenty-two years, having resided as aforesaid, shall be entitled to vote without payment of any tax: *Provided*, that no person in the military, naval, or marine service of the United States shall be considered as acquiring a residence in this State by being stationed in any garrison, barrack, or military or naval-place or station within this State; and no idiot, or insane person, pauper, or person convicted of a crime deemed by law felony, shall enjoy the right of an elector; and that the legislature may impose the forfeiture of the right of suffrage as a punishment for crime."

Chapter 109 of the Revised Statutes of 1853 of the State contains the jury law of Feb. 28, 1849. It is as follows: —

"SECT. 1. All persons qualified to vote at the general election shall be liable to serve as jurors, except public officers of this State, or of the United States, counsellors and attorneys at law, ordained ministers of the gospel, officers of colleges, and teachers of public schools, practising physicians and surgeons regularly licensed, cashiers of incorporated banks, and all persons who are more than seventy years of age.

"SECT. 2. The Levy Court for each county shall, at its annual session in March, select from the list of taxable citizens of such county, in such proportion for each hundred as may be deemed proper, the names of one hundred sober and judicious persons, to serve (if summoned) as grand jurors at the several courts to be holden in that year; and also the names of one hundred and fifty other sober and judicious persons, to serve (if summoned) as petit jurors, at the several courts, other than the courts of quarter sessions, to be holden in that year; and also the names of one hundred and twenty other sober and judicious persons, to serve (if summoned) as jurors at the Court of Quarter Sessions to be holden in that year. There shall be provided for each hundred, three boxes, one of which shall be marked or labelled 'grand jurors,' another 'petit jurors,'

and the other 'quarter sessions jurors,' and each with the names of the hundred. The names of the persons selected as aforesaid shall be written each on a separate ballot, all the ballots being of the same color, size, and shape, and the ballots shall be folded so as to conceal the names written upon them. Those containing the names of persons selected for grand jurors shall be deposited in the boxes marked 'grand jurors,' the names selected from each hundred being placed in the box of that hundred; in like manner the names of persons selected for petit jurors shall be deposited in the boxes marked 'petit jurors,' the names selected from each hundred being placed in the box of that hundred; in like manner the names of persons selected for 'quarter session jurors' shall be deposited in the boxes marked 'quarter sessions jurors,' the names selected from each hundred being placed in the box of that hundred; after which the boxes shall be locked and delivered to the prothonotary and the keys shall be kept by the clerk of the peace. The Levy Court shall preserve lists of the persons selected for jurors, and shall deliver to the said prothonotary, with the boxes aforesaid, copies of said lists signed by the chairman of said court, and countersigned by the clerk thereof, showing the number selected from each hundred.

. . . . . . . . . . . .

" SECT. 4. The prothonotary and clerk of the peace shall, within ten days after the delivery of the said boxes to the prothonotary as above provided, meet in the prothonotary's office, and, first shaking the boxes so as to intermix the ballots, shall, in the presence of such persons as may choose to be present, draw from the box marked 'grand jurors,' in the same proportion for each hundred in which they were selected by the Levy Court, the names of twenty-four persons to be summoned as grand jurors for that year.

" SECT. 5. The prothonotary and clerk of the peace shall, at least twenty days before the commencement of each term of the Superior Court and Court of General Sessions for the county, in like manner draw from the boxes marked 'petit jurors,' in the same proportions for each hundred in which they were selected by the Levy Court, the names of thirty persons to serve as petit jurors at the ensuing term of said courts.

. . . . . . . . . . . .

" SECT. 8. The officers drawing for grand and petit jurors as aforesaid shall, immediately thereafter, deliver to the sheriff of the county a correct list of names of the persons so drawn, with the date of the drawing indorsed thereon.

"SECT. 9. The said boxes shall, immediately after any drawing for jurors, be locked and kept by the prothonotary, the keys being delivered into the custody of the clerk of the peace.

"SECT. 10. The sheriff of the county, upon receiving a list of persons drawn for grand jurors as aforesaid, shall, at least ten days before the next ensuing term of the Court of General Sessions for his county, summon, in writing, each of the said persons to serve as the standing grand jurors for that year at the said court. He shall, in like manner, upon receiving a list of persons drawn for petit jurors as aforesaid, at least ten days before the next ensuing term of the Superior Court and Court of General Sessions, summon, in writing, each of the said persons to serve as petit jurors at the then next term of the said courts respectively.

"The sheriff shall, within one hour after opening of said courts respectively, on the first day of every term, return to each of said courts a separate and distinct panel of persons summoned to attend thereat as grand or petit jurors, showing the Christian and surnames, and places of abode of such jurors.

"SECT. 11. The grand jurors for the year drawn as aforesaid shall be summoned and returned to attend, as grand jurors, at any Court of Oyer and Terminer, when the precept for holding such court directs a grand jury to be summoned.

"For any Court of Oyer and Terminer, forty-eight petit jurors shall, upon notice from the sheriff to the prothonotary and clerk of the peace that such court is to be held, be drawn, summoned and returned according to the foregoing provisions for drawing, summoning and returning petit jurors for the Superior Court and Court of General Sessions : *Provided*, that if the day assigned for holding a Court of Oyer and Terminer shall be at a time when a petit jury is in attendance upon the Superior Court or Court of General Sessions, such jury shall constitute a part of the panel of the petit jurors to be summoned to attend the said Court of Oyer and Terminer, and only the residue of the said number of forty-eight jurors shall be drawn according to the foregoing provisions."

*Mr. Charles Devens* and *Mr. Anthony Higgins* for the plaintiff in error.

1. Where, in any prosecution of a man of African race and color, the Constitution or the law of a State excludes from the grand or the petit jury persons because they are of that race and color, the exclusion operates as a denial to him of the equal protection of the laws, and is forbidden by the Fourteenth

Amendment and the Revised Statutes. The prosecution is thereby brought within the provisions of those statutes which authorize its removal into the Circuit Court of the United States. *Strauder* v. *West Virginia*, 100 U. S. 303; *Virginia* v. *Rives*, id. 313; *Ex parte Virginia*, id. 339.

*a.* The statute and Constitution of Delaware must be taken and construed together in judicially determining what are the qualifications of jurors in that State. It is too plain for argument, that by the express letter of her constitutional and statutory provisions persons of color do not possess the elective franchise, and are excluded from jury service.

*b.* It is said, however, that the Fourteenth Amendment, the Civil Rights Act, the Fifteenth Amendment, and the acts of Congress passed to enforce it, " repealed " those provisions, or " amended " them by striking out the word " white." The argument of the defendant in error upon this point rests upon the assumed identity of the sovereignty of the United States and the several States, and ignores the fundamental truth that each is a separate sovereign which expresses its will through its own legislative body. Neither the Federal Constitution, nor the laws enacted in pursuance of it, " repeal " repugnant State Constitutions or laws. Such a repeal can be effected only by the power which created them. Delaware, so far from striking the word " white " from her Constitution, voted against the adoption of the Fourteenth and the Fifteenth Amendments, and she has never altered her Constitution to conform to them. In 1874 the legislature revised her statutes. The act of Feb. 28, 1849, was republished. Had she desired to carry into effect the amendments, she could by a simple provision have conferred on colored persons the right to sit on juries. They now vote in Delaware, but that results from the obedience of the election officers to the mandate of the Fifteenth Amendment. They are permitted to testify, because the courts acknowledge the validity and paramount authority of the Civil Rights Act and of the amendment upon which it is based. But the legislature has not indicated its acquiescence in the amendments and the laws made to enforce them. It is upon the ground that the impediment to the full protection of the laws exists by force of an express statute that the petition for removal is founded.

It is a conceded fact that a colored man has never been placed on any jury list in Delaware, and it is no answer to his demand for that right to say that he is permitted to testify and vote.

*c.* This court held that the case of *West Virginia* v. *Strauder* should have been removed under sect. 641 of the Revi..d Statutes, because the statute of that State excluding colored persons from juries was repugnant to the Constitution and laws of the United States. The decision is in point here, and its relevancy is not weakened by the fact that the Constitution and statutes of Delaware were in force before, while the statute of West Virginia was passed after, the adoption of the Fourteenth and Fifteenth Amendments and the Civil Rights Acts, including sect. 641, for the removal of causes. The statute of West Virginia being unconstitutional never was a rule of conduct for her people to any greater extent than, after the adoption of the amendments and acts of Congress, the laws of Delaware in conflict therewith were rules of conduct for her people. The law of Delaware and that of West Virginia were equally subject to the same objection, and the point of time at which either was enacted cannot affect the question.

*d.* So long as the Constitution or the laws of a State, denying the equal civil rights of all persons citizens of the United States, remain unrepealed by the State itself, they constitute that " legislative denial of " or " constitutional or legislative impediment to " such rights of which sect. 641 of the Revised Statutes speaks, and which under it makes an important ground for removal.

Mr. Justice Field, in his separate opinion in *Virginia* v. *Rives,* says: " The denial of rights or the inability to enforce them, to which the section refers, is, in my opinion, such as arises from legislative action of the State. . . . If an executive or judicial officer exercises power with which he is not invested by law, and does unauthorized acts, the State is not responsible for them. The action of the judicial officer in such a case, where the rights of a citizen under the laws of the United States are disregarded, may be reviewed and corrected or reversed by this court; it cannot be imputed to the State, so as to make it evidence that she in her sovereign or legislative capacity

denies the rights invaded, or refuses to allow their enforcement." This doctrine, we submit, fully sustains the position which we assume.

*e.* It necessarily follows that the right of a prisoner to a removal of the prosecution, when his petition alleges the necessary jurisdictional facts, is not contingent upon the decision which the court of the State may render, but depends on what the State herself has ordained in her Constitution and laws. The jurisdiction of that court is ousted by filing such a petition, and that of the Federal court at once attaches.

2. The Court of Oyer and Terminer should, on the motion of the prisoner, have quashed the indictment, and the panels of grand jurors and petit jurors, on the ground that the Levy Court of New Castle County had excluded from them all persons of African race and color, because of their race and color. The motion should not have been refused because he produced no evidence *aliunde* in support of the allegations of the petition verified by his own oath.

The matters set forth in his petition were, by consent, to be received with like effect in support of the motion as if they had been incorporated in a separate affidavit. The State law was not only executed according to its letter and its narrow proscribing spirit, but there is a distinct and uncontradicted allegation in the petition that the Levy Court excluded from the jury colored men solely by reason of their race and color.

3. The court should have permitted the prisoner to produce proof in support of the allegations on which the motion to quash was grounded, even after it had been argued and overruled.

*Mr. George Gray*, Attorney-General of Delaware, *contra.*

The truth and sufficiency of the matters set forth in the prisoner's petition for removal must be determined by the court of original jurisdiction, subject to the ultimate revisory power of this court. He did not bring his case within the provisions of sect. 641 of the Revised Statutes.

One of the allegations of the petition is that colored persons are excluded from the grand and petit juries by the Constitution and statutes of Delaware. As there is not a line in either which so excludes them, this allegation, if one of fact, is absolutely unfounded, and if one of law, cannot be sustained.

By the Constitution adopted in 1831 the right of voting was confined to white male citizens, and the jury law declares that persons qualified to vote shall, with certain specified exceptions, be liable to serve on juries. Counsel insist that as the restriction upon the right of suffrage has not been removed in the mode prescribed by the Constitution of Delaware, the jury law must be construed with exclusive reference to the condition of things which existed at the time of its passage. Their contention is that as in Feb. 28, 1849, persons of African descent were not voters, they were not then, nor are they now, competent jurors. That law is prospective in its effect and scope, and would seem to have been drawn in view of all the possibilities of the future. Its true construction is that persons entitled to vote when a grand or a petit jury is selected are liable to serve upon it. Were colored persons so entitled when the jurors were selected in this case? There can be but one answer to this question. The Thirteenth and Fifteenth Amendments being a part of the supreme law of the land, every provision in a State Constitution in conflict with them is null and void. They changed the status of the slave into that of the freeman, and as effectually secured to the colored citizens of Delaware the right of suffrage as if her Constitution had in express terms conferred it. " White " as well as " free," in sect. 1, art. 4, of the existing Constitution is a dead letter. As they have the right to vote, they are liable to serve as jurors. Such is, in effect, the decision of the learned court below, and the fact that they do vote is admitted by the counsel for the prisoner. *Strauder* v. *West Virginia*, upon which they rely, has no application to this case. The State law then under consideration was passed after the adoption of the amendments, and its constitutionality was maintained by the State court.

The right of removal does not depend solely upon the allegations of the petition. If their falsity appears without evidence *aliunde*, as where they relate to a public law or institution, or where facts of which judicial cognizance is always taken are misstated, then the court must be governed by its own knowledge, and say that the *alleged fact* is not really a *fact*. The action below in refusing to order the removal of the cause was obviously proper.

It is maintained on the other side that the court should have quashed the indictment, and the panels of grand and petit jurors, on the ground that the Levy Court had excluded from them all persons of African race and color, because of their race and color; and that the motion should not have been refused because the accused produced no evidence *aliunde* in support of his petition verified by his oath. To this it will be sufficient to say that the granting of the motion on his unsupported allegation of facts, which could not possibly have been within his knowledge, and which, moreover, imputed to all the persons constituting the Levy Court, the commission of grave offences against the law, would reverse all the rules of evidence, overturn all orderly procedure in courts of justice, and contradict the settled maxims of ordinary human experience.

The court properly denied his subsequent application to be allowed to produce as witnesses the commissioners and the clerk and the bailiff of the Levy Court to support the allegations upon which the overruled motion was founded. No prayer for a rehearing was presented, nor was it shown that before the motion was decided due diligence had been used to procure their attendance by process, of which he at all times could have availed himself. The court held " that application for leave to summon witnesses to support a motion which had been argued, and refused because of want of proof, when sufficient time had existed for its production, was without precedent in the Court of Oyer and Terminer of this State, and therefore, in this case, the motion must be treated as coming too late to be granted."

If the motion had been for a rehearing, which in form it was not, but that is the most favorable view in which it can be considered, granting it rested in the discretion of the court, and the action upon it is not subject to review in an appellate tribunal. Refusing to grant a rehearing or a motion for a new trial cannot be assigned for error here, even in a case removed from an inferior court of the United States. The re-examination of the judgments of State courts is limited to a particular class of cases, and to the determination of the Federal questions which they involve. This court, in exercising its jurisdiction

in such cases, has habitually adhered to the construction given below to a local statute, unless such a question was involved. This is believed to be the first attempt to reverse the judgment of a State court upon a ruling which conforms to its established practice, and has no relation to any principle of Federal jurisprudence.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

The assignments of error are numerous, but they are all embraced by the general proposition that the court erred as well in proceeding with the case after the petition for removal was filed, as in denying the motions to quash the indictment, and the panels of jurors.

The first question to which our attention will be directed relates to the assertion, by the accused, of the right of removal under sect. 641 of the Revised Statutes. That section declares that, " When any civil suit or criminal prosecution is commenced in any State court, for any cause whatsoever, against any person who is denied or cannot enforce in the judicial tribunals of the State, or in the part of the State, where such suit or prosecution is pending, any right secured to him by any law providing for the equal civil rights of the citizens of the United States, . . . such suit or prosecution may, upon the petition of such defendant filed in said State court at any time before the trial or final hearing of the cause, stating the facts, and verified by oath, be removed, for trial, into the next Circuit Court to be held in the district where it is pending. Upon the filing of such petition all further proceedings in the State court shall cease," &c.

In *Strauder* v. *West Virginia* (100 U. S. 303), *Virginia* v. *Rives* (id. 313), and *Ex parte Virginia* (id. 339), that section was the subject of careful examination, in connection with sect. 1977, which declares that " all persons within the jurisdiction of the United States shall have the same right, in every State and Territory, to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white persons, and shall be subject to like pains,

penalties, taxes, licenses, and exactions of every kind and no other." We also considered the validity and scope of the act of March 1, 1875, c. 114, which, among other things, declares. that "no citizen, possessing all other qualifications which are or may be prescribed by law, shall be disqualified from service as grand or petit jurors in any court of the United States, or of any State, on account of race, color, or previous condition of servitude." 18 Stat., pt. 3, p. 335.

In those cases it was ruled that these statutory enactments were constitutional exertions of the power to pass appropriate legislation for the enforcement of the provisions of the Fourteenth Amendment, which was designed, primarily, as we held, to secure to the colored race, thereby invested with the rights, privileges, and responsibilities of citizenship, the enjoyment of all the civil rights that, under the law, are enjoyed by white persons; that while a State, consistently with the purposes for which that amendment was adopted, may confine the selection of jurors to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications, a denial to citizens of the African race, because of their color, of the right or privilege accorded to white citizens, of participating, as jurors, in the administration of justice, is a discrimination against the former inconsistent with the amendment, and within the power of Congress, by appropriate legislation, to prevent; that to compel a colored man to submit to a trial before a jury drawn from a panel from which was excluded, because of their color, every man of his race, however well qualified by education and character to discharge the functions of jurors, was a denial of the equal protection of the laws; and that such exclusion of the black race from juries because of their color was not less forbidden by law than would be the exclusion from juries, in the States where the blacks have the majority, of the white race, because of *their* color.

But it was also ruled, in the cases cited, that the constitutional amendment was broader than the provisions of sect. 641 of the Revised Statutes; that since that section only authorized a removal before trial, it did not embrace a case in which a right is denied by judicial action during the trial, or in the sentence, or in the mode of executing the sentence; that for

denials, arising from judicial action, after the trial commenced, the remedy lay in the revisory power of the higher courts of the State, and, ultimately, in the power of review which this court may-exercise over their judgments, whenever rights, privileges, or immunities, secured by the Constitution or laws of the United States, are withheld or violated; and that the denial or inability to enforce in the judicial tribunals of the States, rights secured by any law providing for the equal civil rights of citizens of the United States, to which sect. 641 refers, is, primarily, if not exclusively, a denial of such rights, or an inability to enforce them, resulting from the Constitution or laws of the State, rather than a denial first made manifest at the trial of the case. We held that Congress had not authorized a removal where jury commissioners or other subordinate officers had, without authority derived from the Constitution and laws of the State, excluded colored citizens from juries because of their race.

The essential question, therefore, is whether, at the time the petition for removal was filed, citizens of the African race, otherwise qualified, were, by reason of the Constitution and laws of Delaware, excluded from service on juries because of their color. The court below, all the judges concurring, held that no such exclusion was required or authorized by the Constitution or laws of the State, and, consequently, that the case was not embraced by the removal statute as construed by this court.

The correctness of this position will now be considered.

The Constitution of Delaware, adopted in 1831 (the words of which upon the subject of suffrage had not been changed when the petition for removal was filed, nor since), restricts the right of suffrage at general elections to free white male citizens, of the age of twenty-two years and upwards, who had resided in the State one year next before the election, and the last month thereof in the county where he offers to vote, and who, within two years next before the election, had paid a county tax, which shall have been assessed at least six months before such election, — the prerequisite of a payment of tax being dispensed with in the case of free white male citizens between twenty-one and twenty-two years of age, having the

prescribed residence in the State and county. The only persons excluded·by that Constitution from suffrage are those in the military, naval, or marine service of the United States, stationed in Delaware, idiots, insane persons,.paupers, and those convicted of felonies.

The statute of Delaware, adopted in 1848, and in force at the trial of this case, provides for an annual selection, by the Levy Court of the county, of persons to serve as grand and petit jurors, and from those so selected the prothonotary and clerk of the peace are required to draw the names of such as shall serve for that year, if summoned. It further provides that all qualified to vote at the general election, being "sober and judicious persons," shall be liable to serve as jurors, except public officers of the·State or of the United States, counsellors and attorneys at law, ordained ministers of the gospel, officers of colleges, teachers of public schools, practising physicians and surgeons regularly licensed, cashiers of incorporated banks, and all persons over seventy years of age.

It is thus seen that the statute, by its reference to the constitutional qualifications of voters, apparently restricts the selection of jurors to white male citizens, being voters, and sober and judicious persons. And although it only declares that such citizens shall be liable to serve as jurors, the settled construction of the State court, prior to the adoption of the Fifteenth Amendment, was that no citizen of the African race was competent, under the law, to serve on a·jury.

Now, the argument on behalf of the accused is, that since the statute adopted the standard of voters as the standard for jurors, and since Delaware has never, by any separate or official action of its own, changed the language of ·its Constitution in reference to the class who may exercise the elective franchise, the State is to be regarded, in the sense of the amendment and of the laws enacted for its enforcement, as denying to the col-· ored race within its limits, to this day, the right, upon equal terms with the white race, to participate as jurors in the administration of justice, — and this notwithstanding the adoption of the Fifteenth Amendment and its admitted legal effect upon the constitutions and laws of all the States of the Union.

But to this argument, when urged in the court below, the

State court replied, as does the attorney-general of the State
here, that although the State had never, by a convention, or
popular vote, formally abrogated the provision in its State Con-
stitution restricting suffrage to white citizens, that result had
necessarily followed, as matter of law, from the incorporation
of the Fourteenth and Fifteenth Amendments into the funda-
mental law of the nation; that since the adoption of the latter
amendment neither the legislative, executive, nor judicial au-
thorities of the State had, in any mode, recognized, as an exist-
ing part of its Constitution, that provision which, in words,
discriminates against citizens of the African race in the matter
of suffrage; and, consequently, that the statute prescribing the
qualification of jurors by reference to the qualifications for
voters should be construed as referring to the State Constitu-
tion, as modified or affected by the Fifteenth Amendment.

The question thus presented is of the highest moment to that
race, the security of whose rights of life, liberty, and property,
and to the equal protection of the laws, was the primary object
of the recent amendments to the national Constitution. Its
solution is confessedly attended by many difficulties of a serious
nature, which might have been avoided by more explicit lan-
guage in the statutes passed for the enforcement of the amend-
ments. Much has been left by the legislative department to
mere judicial construction. But upon the fullest consideration
we have been able to give the subject, our conclusion is that
the alleged discrimination in the State of Delaware, against
citizens of the African race, in the matter of service on juries,
does not result from her Constitution and laws.

Beyond question the adoption of the Fifteenth Amendment
had the effect, in law, to remove from the State Constitution,
or render inoperative, that provision which restricts the right
of suffrage to the white race. Thenceforward, the statute
which prescribed the qualifications of jurors was, itself, enlarged
in its operation, so as to embrace all who by the State Consti-
tution, as modified by the supreme law of the land, were quali-
fied to vote at a general election. The presumption should be
indulged, in the first instance, that the State recognizes, as is its
plain duty, an amendment of the Federal Constitution, from
the time of its adoption, as binding on all of its citizens and

every department of its government, and to be enforced, within its limits, without reference to any inconsistent provisions in its own Constitution or statutes.  In this case, that presumption is strengthened, and, indeed, becomes conclusive, not only by the direct adjudication of the State court as to what is the fundamental law of Delaware, but by the entire absence of any statutory enactments or any adjudication, since the adoption of the Fifteenth Amendment, indicating that the State, by its constituted authorities, does not recognize, in the fullest legal sense, the binding force of that amendment and its effect in modifying the State Constitution upon the subject of suffrage.

This abundantly appears from the separate opinions, in this case, of the judges composing the Court of Oyer and Terminer. Comegys, C. J., alluding to the Fifteenth Amendment, and the act of March 1, 1875, said : —

" Returning to the point — that our laws forbid the selection of colored persons as jurors.  We answer this by saying that we have no such laws. . . . The Fourteenth Amendment, therefore, and the act of 1875 passed by Congress as appropriate legislation for its enforcement, or either, are superior to our State Constitution, and it had to give way to them, and it did so give way, and was repealed, so far as the word ' white ' is mentioned, therein as a qualification for a voter at a general election, as soon as the amendment was proclaimed to be adopted, and has been so understood and treated by all persons in this State from that time forth.  Ever since the last civil rights bill was passed by Congress, negroes have been admitted as witnesses in all cases, civil and criminal, tried in our courts ; whereas, before, they could give no evidence in any such cases against a white person except in case of crime, and to prevent a failure of justice, when no white person was present at the time of the transaction competent to give testimony.  There is, then, an excision or erasure of the word ' white ' in the qualification of voters in this State ; and the Constitution is now to be construed as if such word had never been there.  We have, then, no law of this State forbidding the Levy Court to select negroes as jurors, because they are negroes, if in their judgment they are otherwise qualified." . Wales, J., said : " We know, from actual and personal knowledge of the history of

the times, that since the adoption of the Fifteenth Amendment
to the Federal Constitution the provision in the Constitution of
Delaware limiting the right to vote to free white male citizens
has been virtually and practically repealed and annulled, and
that persons of color, otherwise qualified, have exercised and
continue to exercise the elective franchise in all parts of this
State with the same freedom as the whites. It is not neces-
sary to prove this fact. . . . But there is really no difficulty in
reaching the conclusion that under the law regulating the selec-
tion of jurors the colored citizen is not excluded. That law
was intended by its authors to be prospective in its operation
and effect and to include all who would become voters after its
passage, as well as the class of persons who were then entitled
to vote. It was not a temporary statute, intended only to pro-
vide for the then existing state of things, but to reach forward
and make one unvarying standard for the qualification of a
juror, to wit, that he should be qualified to vote at the general
election. This was not the sole standard, but it is the only one
pertinent to the discussion of the motion to remove. Whoever,
thereafter, might become qualified voters in the State, whether
by virtue of amendment to its Constitution, or by virtue of ' the
supreme law of the land,' that overrides and supplants State
constitutions and State laws, *eo instanti* became qualified for
selection and service as jurors. . . . The right secured to the
colored man under the Fourteenth Amendment and the civil
rights laws is that he shall not be discriminated against solely
on account of his race or color, and it follows that no State
law can for that cause alone exclude him from the jury box,
nor can a State officer be permitted, in the performance of his
official duties, to purposely keep the colored man off the jury
lists." Houston, J., concurred in the opinion of the other
judges, and expressed his surprise that the petition for removal
contained the statement that the colored man is not a voter in
Delaware by its Constitution and laws. That he said, " is not
true, and ought not to be asserted; because there is not a law-
yer of any political party that has ever doubted, since the adop-
tion of the Fourteenth Amendment to the Constitution of the
United States, that the word ' white,' in our Constitution, was
entirely stricken out. That goes to the root of the whole mat-

ter, and there is no discrimination in the Constitution or laws of our State against colored men as jurors."

There is another consideration upon this branch of the case which is entitled to weight. In some of the States, particularly those in which slavery formerly existed, no alteration of the Constitution was possible except in the particular mode prescribed, unless, indeed, the people assumed to disregard the express limitations which their own fundamental law imposed upon the power of amendment. If the Constitution is obeyed, no alteration of its provisions could, in some of the States, be effected short of several years. And if the position taken by counsel be correct, so long as the mere language of the Constitution, as originally framed and adopted by a State, is inconsistent with that equality of civil rights secured by the recent amendments to the Federal Constitution, every civil suit or criminal prosecution in that State, against a colored man, would be removable, under sect. 641 of the Revised Statutes, into the Circuit Court of the United States, although the State, by all its organs of authority, — legislative, executive, and judicial, — should, without reservation or qualification, recognize the legal effect as well of the amendments as of the statutes enacted to enforce them. We cannot believe that the section was intended by Congress to be so far-reaching in its results, or that a reasonable construction of it requires us to hold that the State of Delaware, by its Constitution and laws, denies or prevents, or impairs the enforcement, in its judicial tribunals, of rights secured by any law providing for the equal civil rights of citizens of the United States. Had the State, since the adoption of the Fourteenth Amendment, passed any statute in conflict with its provisions, or with the laws enacted for their enforcement, or had its judicial tribunals, by their decisions, repudiated that amendment as a part of the supreme law of the land, or declared the acts passed to enforce its provisions to be inoperative and void, there would have been just ground to hold that there was such a denial, upon its part, of equal civil rights, or such an inability to enforce them in those tribunals, as, under the Constitution and within the meaning of that section, would authorize a removal of the suit or prosecution to the Circuit Court of the United States. No such case is presented

here.   The discrimination complained of does not result from the Constitution or laws of the State, as expounded by its highest judicial tribunal; and, consequently, it could not be made manifest until after the action of the State court in the case commenced.   The prosecution against the plaintiff in error was not, therefore, removable into the Circuit Court, under sect. 641.   In thus construing the statute we do not withhold from a party claiming that he is denied, or cannot enforce in the judicial tribunals of the State, his constitutional equality of civil rights, all opportunity of appealing to the courts of the Union for the redress of his wrongs.   For, if not entitled, under the statute, to the removal of the suit or prosecution, he may, when denied, in the subsequent proceedings of the State court, or in the execution of its judgment, any right, privilege, or immunity given or secured to him by the Constitution or laws of the United States, bring the case here for review.

What we have said leads to the conclusion that the State court did not err in refusing to grant the prayer of the petitioner for removal.

The remaining question relates to the denial of the motions to quash the indictment and the panels of jurors.   The grounds upon which the motions are placed were formally and distinctly stated, and are fully set out in the bill of exceptions.   They were the same as those assigned in the verified petition filed by the accused for the removal of the prosecution into the Circuit Court of the United States, viz. that from the grand jury that found, and from the petit jury that was summoned to try, the indictment, citizens of the African race, qualified in all respects to serve as jurors, were excluded from the panels, because of their race and color; and that, in fact, persons of that race, though possessing all the requisite qualifications, have always, in that county and State, been excluded because of their race from serving on juries.   That colored persons have always been excluded from juries in the courts of Delaware was conceded in argument, and was likewise conceded in the court below.   The Chief Justice, however, accompanied that concession with the remark in reference to this case, "that none but white men were selected is in nowise remarkable in view of the fact — too notorious to be ignored — that the

great body of black men residing in this State are utterly un-
qualified by want of intelligence, experience, or moral integrity
to sit on juries." The exceptions, he said, were rare.

Although for the reasons we have given the prisoner was not
entitled to a removal of this prosecution into the Circuit Court
of the United States, he is not without remedy if the officers of
the State charged with the duty of selecting jurors were guilty
of the offence charged in his petition. A denial upon their
part, of his right to a selection of grand and petit jurors with-
out discrimination against his race, because of their race,
would be a violation of the Constitution and laws of the United
States, which the trial court was bound to redress. As said
by us in *Virginia* v. *Rives, supra,* " The court will correct the
wrong, will quash the indictment, or the panel; or, if not, the
error will be corrected in a superior court," and ultimately in
this court upon review.

We repeat what was said in that case, that while a colored
citizen, party to a trial involving his life, liberty, or property,
cannot claim, as matter of right, that his race shall have a
representation on the jury, and while a mixed jury, in a par-
ticular case, is not within the meaning of the Constitution,
always or absolutely necessary to the equal protection of the
laws, it *is* a right to which he is entitled, " that in the selec-
tion of jurors to pass upon his life, liberty, or property, there
shall be no exclusion of his race, and no discrimination against
them, because of their color." So that we need only inquire
whether, upon the showing made by the accused, the court
erred in overruling the motions to quash the indictment and
the panels of jurors.

We are informed by the bill of exceptions that when the
motions to quash were made, it was agreed between the State,
by its attorney-general, and the prisoner, by his counsel, with
the assent of the court, that the statements and allegations in
the petition for removal " should be taken and treated, and
given the same force and effect, in the consideration and deci-
sion " of the motions, " as if said statements and allegations
were made and verified by the defendant in a separate and dis-
tinct affidavit" The only object which the prisoner's counsel
could have had in filing the affidavit was to establish the grounds

upon which the motions to quash were rested. It was in the discretion of the court to hear the motions upon affidavit. No counter affidavits were filed in behalf of the prosecution. Nor does it appear that, on the hearing of the motions, the State controverted, in any form, the allegation, made with the utmost directness, that her officers had purposely excluded from the juries, because of their color, citizens of the African race, qualified to perform jury service. Nor does the bill of exceptions disclose any suggestion or intimation, by the State, of any objection to the prisoner's affidavit as evidence in support of the motions. Under these circumstances, without any evidence, by affidavit or otherwise, upon the part of the State, the motions to quash were submitted for determination. They were overruled, upon the ground that "no evidence had been produced, or offered by the accused," to prove that the alleged exclusion of colored persons from the juries was because of their color. The court said that such fact of exclusion could not be established by the circumstance that no persons of the African race were, in fact, on the panels; but "should have been proven affirmatively on the part of the defendant, and by competent testimony, outside of his affidavit, before said motions to quash could be granted."

Thereupon, before the accused had even been arraigned, or had pleaded to the indictment, he further moved the court to permit him to produce, as witnesses, in support of the motions to quash, "the commissioners of the Levy Court, and the clerk and bailiff of said Levy Court, and that the court should issue by its clerk subpœnas for said persons as witnesses to testify as aforesaid." To the granting of that motion the attorney-general of the State objected, and his objection was sustained. The bill shows that the motion to go into further proof was denied "on the ground that full time to produce such witnesses to make such proof had existed before the motion was heard; that application for leave to summon witnesses to support a motion which had been argued and refused, because of want of proof, when sufficient time had existed for its production, was without precedent in the Court of Oyer and Terminer in this State, and, therefore, in this case, the motion must be treated as coming too late to be granted."

It may be argued that the ruling of the court whereby the prisoner was denied the privilege, after the motions to quash were overruled, and before the trial commenced, of making further proof in support of the charge that both grand and petit juries had been selected in violation of the Constitution and laws of the United States, is not the subject of review in this court. Without discussing that proposition, we may remark, with entire respect for the court below, that the circumstances, in our judgment, warranted more indulgence, in the matter of time, than was granted to a prisoner whose life was at stake, and who was too poor to employ counsel of his own selection. If it be suggested that the commissioners, when summoned, could not have been compelled to testify, it may be answered that they might not have claimed any such exemption. But that objection, however plausible or weighty, did not apply to the clerk and bailiff of the Levy Court. The clerk of the Court of Oyer and Terminer was himself, as we are advised by the opinion of the Chief Justice, the clerk of the Levy Court, attending its sessions and assisting in the transaction of its business. That officer, we may presume, was present in court when the application to examine him as a witness was made. He and the bailiff were in a position, perhaps, to clearly sustain or clearly disprove the allegation that the grand and petit juries were organized upon the principle of excluding therefrom all colored persons, because of their race, — a charge involving the fairness and integrity of the whole proceeding against the prisoner.

But passing by this ruling of the court below as insufficient, in itself, to authorize a reversal of the judgment, we are of opinion that the motions to quash, sustained by the affidavit of the accused, — which appears to have been filed in support of the motions, without objection to its competency as evidence, and was uncontradicted by counter affidavits, or even by a formal denial of the grounds assigned, — should have been sustained. If, under the practice which obtains in the courts of the State, the affidavit of the prisoner could not, if objected to, be used as evidence in support of a motion to quash, the State could waive that objection, either expressly or by not making it at the proper time. No such objection appears to have been made by its attorney-general. On the contrary, the agreement

that the prisoner's verified petition should be treated as an affidavit " in the consideration and decision " of the motions, implied, as we think, that the State was willing to risk their determination upon the case as made by that affidavit, in connection, of course, with any facts of which the court might take judicial notice. The showing thus made, including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned as a juror in the courts of the State, — although its colored population exceeded twenty thousand in 1870, and in. 1880 exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand, — presented a *prima facie* case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States. It was, we think, under all the circumstances, a violent presumption which the State court indulged, that such uniform exclusion of that race from juries, during a period of many years, was solely because, in the judgment of those officers, fairly exercised, the black race in Delaware were utterly disqualified, by want of intelligence, experience, or moral integrity, to sit on juries. The action of those officers in the premises is to be deemed the act of the State; and the refusal of the State court to redress the wrong by them committed was a denial of a right secured to the prisoner by the Constitution and laws of the United States. Speaking by Mr. Justice Strong, in *Ex parte Virginia*, we said, and now repeat, that " a State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are executed, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of 'public position under a State government, deprives another of property, life, or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's authority, his act is that of the State. This must be, or the constitutional prohibition has no meaning."

The judgment of the Court of Oyer and Terminer will be reversed, with directions to set aside the judgment and verdict, as well as the order denying the motion to quash the indictment and panels of jurors, and for such proceedings, upon a further hearing of those motions, as may be consistent with the principles of this opinion ; and it is

*So ordered.*

MR. CHIEF JUSTICE WAITE and MR. JUSTICE FIELD dissented.

MR. CHIEF JUSTICE WAITE. I am unable to concur in this judgment. We said in *Virginia* v. *Rives* (100 U. S. 313), that the mere fact that no person of color had been allowed to serve on juries where colored men were interested, was not enough to show that they had been discriminated against because of their race. That is all that was shown in this case on the motions to quash, except that the accused declared in his affidavit that the exclusion of colored men from juries in Delaware had been because of their race. I cannot believe that the refusal of the court, on such an affidavit unsupported by any evidence, to quash the indictment and the panel of jurors because he had been discriminated against on account of his race, was such an error in law as to justify a reversal of the judgment. As the motions had once been submitted on his affidavit alone and decided, it rested in the discretion of the court to allow a rehearing and permit further evidence to be introduced. The refusal of the court to do so cannot, as I think, be assigned for error here.

MR. JUSTICE FIELD. I am unable to concur with the majority of the court in the decision in this case. It proceeds upon two assumptions, both of which, in my judgment, are erroneous: one, that on motions to the court the averments of a party as to matters not resting within his personal knowledge, if not specially contradicted, are to be taken as true; the other, that the clause in the Fourteenth Amendment to the Constitution, prohibiting the States from denying to any person within their jurisdiction the equal protection of the laws requires them,

in cases affecting the rights and interests of persons of the colored race, to summon persons of that race for jury service.

The defendant, who is a colored man, was indicted in May, 1880, in the court of general sessions for the county of New Castle, in the State of Delaware, for a rape upon a white woman, a crime punishable in that State with death. On motion of the attorney-general of the State, the indictment was removed for trial to the Court of Oyer and Terminer of the county. The defendant then presented a petition, praying for its removal to the Circuit Court of the United States, setting forth as grounds for the application, that he was a citizen of the United States and of the State of Delaware, of African race and descent; that by the statutes of the State all persons qualified to vote at its general elections were liable to serve as jurors, with certain exceptions, not important to be here mentioned; but that, by the Constitution of the State, the right of an elector was enjoyed only by free white male citizens over the age of twenty-one years; that the Levy Court of New Castle County was required, at its annual session in March, to select from the list of the taxable citizens of the county the names of one hundred sober and judicious persons to serve, if summoned, as grand jurors at the several courts to be held that year; and also the names of one hundred and fifty other sober and judicious persons to serve, if summoned, as petit jurors in such courts; that the Levy Court, at its session in March, 1880, in thus selecting persons to serve, if summoned, as grand and petit jurors in those courts, including that of the general sessions and that of Oyer and Terminer, had selected no persons of color or African race, but, on the contrary, had excluded them because of their race and color; that the prothonotary and clerk of the peace of the county had drawn from the list of those thus selected the grand jurors by whom the indictment against the petitioner was found, and the petit jurors by whom he was to be tried, and that persons of color and of African race, though otherwise qualified, had always been excluded from serving on juries, in the county and State, because of their race and color; that by reason thereof, the petitioner, in the finding of the indictment had been, and in the trial thereof would be, denied the equal protection of the laws; and further, that by the exclusion of all

persons of color and African race from the grand and petit juries of the State, by force of its Constitution and laws, the petitioner was denied, and could not enforce in its judicial tribunals, the right secured to him by the act of Congress providing for the equal civil rights of citizens of the United States.

The Constitution of Delaware was adopted in 1831; and the counsel for the defendant, in presenting the petition, assumed that its limitation of the right of suffrage to white male citizens was still operative, notwithstanding the Fifteenth Amendment, and that as white persons are there named as electors, only such were allowed to serve as jurors. But this view is clearly untenable. The Fifteenth Amendment took effect upon its adoption, and operated to strike out the word " white " from the Constitution of Delaware; and such has been the uniform ruling of the courts of that State. The Court of Oyer and Terminer, accordingly, held that there was no law of the State forbidding the Levy Court to select persons of African race and color as jurors because of their race and color, if otherwise qualified; and further, that it did not appear that the grand and petit juries, though composed entirely of white persons, were so made up by the exclusion of colored persons on the ground of their race and color, or that the defendant was denied any right secured to him as a citizen of the United States through the selection of those panels. The application for a removal of the indictment to the United States Circuit Court was, therefore, denied. It is not necessary to justify this ruling by any extended argument, for it is held by a majority of this court that the removal was properly refused.

The defendant then moved to quash the indictment and the panel of grand jurors by which it was found, and the panel of petit jurors summoned for its trial, giving as reasons for the motion the action of the Levy Court in selecting persons to serve, if summoned, as grand and petit jurors, and the action of the prothonotary and clerk of the peace of the county in drawing the jurors from the list of those selected, and the consequent deprivation of the petitioner's rights, all of which are stated in the petition for the removal of the case. No additional affidavit was filed; but the attorney-general of the State waived this omission, and consented that the statements in that petition

should be taken and treated as of the same force and effect in the consideration of the motion to quash as if presented by a separate affidavit. The motion was then heard, and after being retained under advisement for some days was denied, because, although in fact no persons of African race or color were on the panel either of the grand or petit jury, no evidence had been produced or offered by the defendant to prove his statement that the exclusion was by reason of their color or race, and the court could not accept such fact as established from the circumstance that no such persons were on either list or panel, nor from the unaided affidavit of the defendant; but held, that it should have been proved affirmatively by competent testimony outside of his own affidavit. This ruling constitutes, in the opinion of the majority of the court, reversible error.

It is obvious that the mere fact that no persons of the colored race were selected as jurors is not evidence that such persons were excluded on account of their race or color. The law only required one hundred "sober and judicious" persons to be selected to serve as grand jurors, and one hundred and fifty such persons as petit jurors, out of the whole body of the county, and these numbers may have been selected without any other consideration than their merit and fitness to perform jury duty. There is no suggestion that the grand jurors by whom the indictment was found, or the petit jurors summoned for the trial, had not the prescribed qualifications, and were not "sober and judicious" men. It would seem, when the law has been obeyed, as in this case, that something more than the mere absence of colored persons from the panels should be shown before they can be set aside. And the fact that colored persons had never, since the act of Congress of May 1, 1875, been selected as jurors may be attributed to other causes than those of race and color.

In *Virginia* v. *Rives*, which was before us at the last term it was urged for the removal of the indictment against person of the colored race from the State to the Federal court, that the grand jury by which they were indicted, and the jury by which they were to be tried, were composed wholly of persons of the white race, and that none of their race had ever been

allowed to serve as jurors in the county of Patrick (where the indictment was found, and the trial was to take place), in any case in which a colored man was interested; but the court, speaking through Mr. Justice Strong, said that this statement fell " short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their color or race. The facts may have been as stated, and yet the jury which indicted them, and the panel summoned to try them, may have been impartially selected." 100 U. S. 313, 322. Upon this subject the court below said:—

" That none but white men were selected is in nowise remarkable in view of the fact — too notorious to be ignored — that the great body of black men residing in this State are utterly unqualified by want of intelligence, experience, or moral integrity to sit on juries. Exceptions there are, unquestionably, but they are rare, and so much so, that it is not often that more than one colored man appears upon a panel in the United States courts which have a whole State to select from; whereas in this case the selection was confined to a single county. And in support of the suggestion of unfitness, we have the fact that though the constitutional amendment and the legislation ' appropriate ' to carry it into effect have been in force, the former for about fifteen years and the latter over five years, yet no instance has yet occurred where parties to a proceeding — and they are very often colored men - -have ever selected a man of African descent as a referee. This fact is not to be disregarded in assigning a cause for the exclusion of negroes from juries, if such exclusion could be shown to have been made. With our knowledge, as men of the State, of the African race in Delaware, and of the circumstance just referred to, it would be wholly unwarranted in us to infer exclusion for the mere reason of color, because our juries are, in point of fact, composed of white men alone; or to entertain a suspicion of such cause unless it had better support than the wholly unsupported affidavit of the defendant. To impute to the levy court a purpose to do otherwise than perform their duty by the selection of ' sober and judicious ' persons to serve upon the juries, as the law requires, would be a wrong on our part upon the well-known principle that, in the absence of proof to the contrary, a public officer,

discharging an official obligation or function, is to be presumed to have done it faithfully according to law."

It also seems to me plain that the court below properly refused to accept as true the statements in the defendant's affidavit. If the unsupported statements of a party thus made could be taken as true, on a motion to quash, very few indictments would stand before the affidavits which would be offered. Here the affidavit was as to matters which could not possibly have been within the knowledge of the petitioner. However positive his averments, they must, therefore, be taken, like the averments as to the law of the State, as made upon information and belief only. It also imputed grave offences to the officers of the Levy Court, if the act of Congress on the subject of jurors in State courts is valid. Under these circumstances, to accept as conclusive his statements would be — as was well observed by counsel — to reverse all the rules of evidence, overturn all orderly procedure in courts of justice, and contradict the settled maxims of ordinary human experience. It would be giving to his expression of opinion and belief, as to the criminal conduct of public officers, the force of positive proof.

After the decision of the motion the defendant applied for leave to produce the commissioners and the clerk and bailiff of the Levy Court as witnesses to establish his statements, and that subpœnas be issued for them. This application was denied on the ground that sufficient time had existed to produce such witnesses before the motion was heard, the court observing that " application for leave to summon witnesses to support a motion which had been argued and refused because of want of proof, when sufficient time had existed for its production, was without precedent in the Court of Oyer and Terminer of the State, and, therefore, in this case, the motion must be treated as coming too late." I may add to what is thus stated, that, so far as my knowledge extends, the application is without precedent in any court. Applications may be heard for a rehearing; but until a rehearing is had it is not permissible to call witnesses for the motion already decided. Besides this consideration, there was no affidavit, nor suggestion, by the defendant that the officers named would support his statement. His

motion was simply for permission to make the experiment by calling them to the stand. The prothonotary and clerk of the peace were not shown to have had any knowledge on the subject; and the commissioners of the Levy Court could not have been required to answer as to the asserted fact that persons were excluded by them from the jury list on account of their race or color. If the law of Congress prohibiting such exclusion be valid, the commissioners by such action would have subjected themselves to penalties. And, whilst it is true that a witness may not claim exemption from answering questions where the answer might subject him to a criminal prosecution, yet it would be an unusual thing to require parties to be summoned upon a suggestion that they might be willing to criminate themselves and thus furnish support to a motion. The refusal to allow the defendant to make such an experiment with the commissioners, and to enter on an exploring expedition with the others named, does not appear to be a harsh ruling meriting animadversion, but one perfectly just and proper. And in this connection the statement of counsel of the defendant in their printed brief is not to be overlooked, that it was not in his power " to produce any evidence of the intent with which the Levy Court excluded men of his race and color from the jury lists, other than the presumptive evidence already discussed," — that is, such as arose from the fact that they had always been excluded from jury service; a statement which is equivalent to an admission that the right for which counsel now contend, had it been allowed to the defendant, would have been of no avail to him.

But erroneous as I deem the ruling of the majority of this court in the weight accorded to the unsupported averments of the defendant, as to matters not within his personal knowledge, the meaning given to the concluding clause of the Fourteenth Amendment presents a matter for consideration of far greater importance. True, the opinion only reaffirms the doctrine in the cases from Virginia decided at the last term. I thought the doctrine erroneous then, and with great deference to my associates, I must say, that after a careful and repeated perusal of their opinion, my conviction remains unchanged. The legislation of Congress, which requires persons of the colored race

to be admitted to serve as jurors in State courts, is contained in the fourth section of the act of March 1, 1875, c. 114, " to protect all citizens in their civil and legal rights," which declares : " That no citizen possessing all other qualifications, which are or may be prescribed by law, shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude ; and any officer or other person charged with any duty in the selection or summoning of jurors, who shall exclude or fail to summon any citizen for the cause aforesaid, shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five thousand dollars."

Before the adoption of the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution, no one would have pretended that Congress possessed any power to legislate with respect to jurors — grand or petit — in the State courts. Upon no one subject would there have been a more general concurrence of opinion than that their selection was a matter entirely of State regulation ; that it was for the States exclusively to determine who should be liable to serve as jurors in their courts, what qualifications they should possess, and in what manner they should be selected. Indeed, it was competent for the States to dispense completely with juries, and to require all suits, civil and criminal, to be determined without their aid.

Of the three amendments, it is plain that the Thirteenth and Fifteenth have no bearing upon the selection of jurors. The Thirteenth prohibits slavery and involuntary servitude, except in punishment for crime, within the United States, or in any other place subject to their jurisdiction. It makes every one within all our broad domain, and wherever our jurisdiction extends, on land or sea, a freeman, with the same right to pursue his happiness as all others, and on like conditions. But it does not undertake to do anything more ; it does not confer any political rights ; it leaves the States with all their previous powers to determine who shall fill their offices and be intrusted with the administration of their laws. A similar provision was found in the constitutions of all the Free States, and it was never supposed that it impaired in any respect the sovereign

right and power of the people of every State to determine to
whom they would confide the trusts of government.

The Fifteenth Amendment only prohibits the denial or abridg-
ment of the elective franchise to citizens by reason of their race,
color, or previous condition of servitude.   It excludes from the·
power of the State one ground of limitation upon the quali-
fication of voters ; it relates to no other subject.   It is, then,
to the Fourteenth Amendment that the advocates of the con-
gressional act must resort to find authority for its enactment,
and to the first section of that amendment, which is as follows :
" All persons born or naturalized in the United States, and
subject to the jurisdiction thereof, are citizens of the United
States, and of the State wherein they reside.   No State shall
make or enforce any law which shall abridge the privileges or
immunities of citizens of the United States, nor shall any State
deprive any person of life, liberty, or property, without due
process of law, nor deny to any person within its jurisdiction
the equal protection of the laws."

In the first clause of this section, declaring who are citizens
of the United States, there is nothing which touches the subject
under consideration.   The second clause, declaring that "no
State shall make or enforce any law which will abridge the
privileges or immunities of citizens of the United States," is
limited, according to the decision of this court in *Slaughter-*
*House Cases*, to such privileges and immunities as belong to
citizens of the United States, as distinguished from those of
citizens of the State.   If this construction be sound, — and,
restricted as it is, it has not been overruled by those who ap-
prove of a loose and latitudinarian construction of another
clause of the same section, — it will not be contended that the
privilege of persons to act as jurors is covered by the inhibi-
tion.   But if a broader construction be given to the clause, such
as was advocated by the dissenting judges in *Slaughter-House*
*Cases*, the inhibition can have no application.   The Constitu-
tion, previous to this amendment, declared that " the citizens
of each State shall be entitled to all privileges and immunities
of citizens in the several States," and it was never supposed or
contended that jury duty or jury service was included among
those privileges and immunities.   The third clause, which

declares that no State shall deprive any person of life, liberty, or property without due process of law, has no reference to this subject. That is a provision found in all our State constitutions from the origin of the government, and is intended to protect life, liberty, and property from arbitrary legislation. It is upon the last clause of the section that the majority of the court are compelled to rely to sustain the act of Congress. "No State shall deny to any person within its jurisdiction the equal protection of the laws." What, then, is meant by this provision, "equal protection of the laws"? All persons within the jurisdiction of the State, whether citizens or foreigners, male or female, old or young, are embraced in its comprehensive terms. If to give equal protection to them requires that persons of the classes to which they severally belong shall have the privilege or be subject to the duty — whichever it may be — of acting as jurors in the courts in cases affecting their interests, the mandate of the Constitution will produce a most extraordinary change in the administration of the laws of the States; it will abolish the distinctions made in the selection of jurors between citizens and foreigners, and between those of our race and those of the Mongolian, Indian, and other races, who may be at the time within their jurisdiction. A Chinaman may insist that people of his race shall be summoned as jurors in cases affecting his interests, and that the exclusion is a denial to him of the equal protection of the laws. Any foreigner, sojourning in the country, may make a similar claim for jurors of his nation. It is obvious that no such claim would be respected, and yet I am unable to see why it should not be sustained, if the construction placed upon the amendment by the majority of the court in this case be sound.

It seems to me that the universality of the protection contemplated by the clause in question renders the position of the majority of the court untenable. No one can truly affirm that women, the aged, and the resident foreigner, whether Caucasian or Mongolian, though excluded from acting as jurors, are not as equally protected by the laws of the State as those who are allowed or required to serve in that capacity. To afford equality of protection to all persons by its laws does not require the State to permit all persons to participate equally in the

administration of those laws, or to hold its offices, or to discharge the trusts of government. Equal protection of the laws of a State is extended to persons within its jurisdiction, within the meaning of the amendment, when its courts are open to them on the same terms as to others, with like rules of evidence and modes of procedure, for the security of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; when they are subjected to no restrictions in the acquisition of property, the enjoyment of personal liberty, and the pursuit of happiness, which do not equally affect others; when they are liable to no other nor greater burdens or charges than such as are laid upon others, and when no different nor greater punishment is enforced against them for a violation of the laws. When this condition of things exists in a State, there is that equality before the law which is guaranteed to all persons within its jurisdiction. The amendment, as I said in *Ex parte Virginia,* " secures to all persons their civil rights upon the same terms; but it leaves political rights, or such as arise from the form of government and its administration, as they stood previous to its adoption. It has no' more reference to them than it has to social rights and duties, which do not rest upon any positive law, though they are more potential in controlling the intercourse of individuals. . . . This is manifest from the fact that when it was desired to confer political power upon the newly made citizens of the States, as was done by inhibiting the denial to them of the suffrage on account of race, color, or previous condition of servitude, a new amendment was required." 100 U. S. 339, 368.

The position that in cases where the rights of colored persons are concerned it is essential for their protection that individuals of their race should be summoned as jurors, is founded upon the assumption that in such cases white persons will be prejudiced jurors. " If this position," as I said in the case cited, " be correct, there ought not to be any white persons on the jury when the interests of colored persons only are involved. That jury would not be an honest or fair one, of which any of its members should be governed in his judgment by other considerations than the law and the evidence; and.

that decision would hardly be considered just which should be reached by a sort of compromise, in which the prejudices of one race were set off against the prejudices of the other." Id. 369.

As I am unable to find any warrant in the Fourteenth Amendment for the legislation of Congress interfering with the selection of jurors in the State courts, or to perceive, even if that legislation be deemed valid, any error in the ruling of the court of Delaware I am of opinion that its judgment should be affirmed.