UNITED STATES v. LACKEY.

SAME v. CONNERS et al.

(District Court, D. Kentucky. February 19, 1900.)

1. ELECTIONS—OFFENSES AGAINST RIGHT OF SUFFRAGE—RIGHTS SECURED BY FIFTEENTH AMENDMENT.

The fifteenth constitutional amendment, within the limitations specified, applies generally to the elective franchise, prohibiting the denial or abridgment of the right to vote on account of race, color, or previous condition of servitude, whenever, wherever, or however such right is sought to be exercised; and Rev. St. §§ 5507, 5508, which were enacted as a part of the legislation for the enforcement of such amendment, under the power conferred on congress by section 2 thereof, are not limited to elections for representatives in congress, but apply equally to all elections, whether national, state, or municipal.

2. SAME—CONSTITUTIONALITY OF LEGISLATION.

The fifteenth amendment secures to citizens of the United States the right of exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude, which right congress has the power to protect by appropriate legislation, not only against hostile action by the states, but also against outrage,

violence, or combinations on the part of individuals, irrespective of state laws; and Rev. St. § 5508, providing for the punishment of conspiracies to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of "any right or privilege secured by the constitution or laws of the United States," is within such power, as applied to conspiracies to defeat the right secured by such amendment, and is constitutional.

**3. Same.**

The fifteenth amendment was meant to guaranty and secure to the negro, as such, the same right to vote that the white man, as such, has; and, under the power conferred upon congress to enforce the same by appropriate legislation, any legislation having in view the sole object of protecting that right, if adapted to that end, and not otherwise unconstitutional, is valid.

**4. Same.**

Rev. St. § 5507, providing for the punishment of "every person who prevents, hinders, controls, or intimidates another from exercising the right of suffrage, to whom that right is guarantied by the fifteenth amendment to the constitution of the United States, by means of bribery or threats," etc., being limited by its terms to the protection of rights guarantied by the fifteenth amendment, and being reasonably adapted to that end, is "appropriate legislation" for the enforcement of such article.

**5. Same—Effect of Fifteenth Amendment.**

The right of citizens of the negro race to vote was in many states derived directly from the fifteenth amendment, which by its own force alone nullified provisions of state constitutions excluding them from such right on account of color; and, so far as such citizens are concerned, the right, however originating, is guarantied by that amendment against denial or abridgment on account of their race, color, or previous condition of servitude.

**6. Same—Applicability of Statutes to State Elections.**

Neither the fifteenth amendment, nor the statutes enacted for its enforcement, were intended, in any primary sense, to protect any right or interest of the United States; and the fact that the national government had no direct interest in an election does not affect the applicability thereto of such statutes, or constitute a defense to an indictment for their violation in connection with such election.

**7. Criminal Law—Repeal of Portion of Statute—Effect.**

The repeal of Rev. St. § 5506, did not render section 5507 ineffective, because of the provision therein that the penalties for its violation shall be "those prescribed in the preceding section." For the purposes of such reference, the penalties so prescribed still remain unaffected by the repeal of the section as such.

**8. Indictment—Sufficiency—Conspiracy to Prevent Colored Men from Voting.**

An indictment is sufficient, under Rev. St. § 5508, which charges the defendants with conspiring to injure, oppress, threaten, and intimidate certain colored men in the exercise of their right to vote, to which they were legally entitled, on account of their race and color, and need not charge, in terms, that the right injured was the right not to be discriminated against on account of race, color, or previous condition of servitude.

**9. Criminal Law—Jurisdiction—Federal and State Courts.**

The fact that an act constitutes an offense under the statutes of a state, cognizable only in the state courts, does not deprive a federal court of jurisdiction to entertain a prosecution based on the same act, where it also constitutes an offense against the laws of the United States.

These are prosecutions by the United States for violations of the statutes enacted to enforce the fifteenth constitutional amendment. On demurrers to indictments.

R. D. Hill, U. S. Atty., and John G. Fitzpatrick, Asst. U. S. Atty.

Strother & Gordon, Swager Sherley, Isaac T. Woodson, Samuel E. Blackburn, John B. O'Neal, Bishop & Hendrick, J. R. Morton, George C. Webb, Maury Kemper, J. H. Mulligan, C. J. Bronston, John W. Yerkes, and W. G. Welch, for defendants.

EVANS, District Judge. The indictment in the first of the cases named is for a violation of section 5507, and that in the second is for a violation of section 5508, of the Revised Statutes of the United States; all the aggrieved persons being men of color, of the African race, and the wrongs committed being charged to have been committed on account of that fact. A demurrer has been interposed to each indictment, and, as a decision in both cases depends in a large measure upon the same principles, they may conveniently be disposed of in one opinion.

When the statutory provisions referred to are considered solely with reference to the meaning of the language used, and with regard to the general purpose to be accomplished, we find that congress intended to protect the right of suffrage, and to prevent its abridgment or denial, by prescribing: First, in section 5507, punishment for those who, by means of bribery or certain forms of threats, either prevented, hindered, controlled, or intimidated a described class of persons from exercising or in exercising the right of suffrage, namely, those persons, but only those persons, to whom that right was guarantied by the fifteenth amendment to the constitution; and, second, in section 5508, by prescribing punishment for those who conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise and enjoyment of any right or privilege secured to him by the constitution or laws of the United States. There would be some hardihood in a serious contention that either of the objects disclosed by this analysis of the sections referred to was, per se, wrong, or fairly subject to any just criticism. On the contrary, those objects are manifestly just and commendable in the estimation of every right-thinking man. When we go further, and consider that the purpose, in some important respects, was to assist in guarding the right to vote so recently given by the nation itself to a certain class of its citizens, it suggests the reflection that free and fair elections, at which the honest, intelligent, and uncontrolled choice of the qualified voters of the community shall be fairly ascertained and announced, are the only sure foundations of free institutions, and the only real guaranty of the liberties of the people. If the first are systematically denied or prevented, the others may be sooner or later overthrown. True, under our form of government, the state authorities must, for the most part, enforce and preserve these safeguards; but so essential to our happiness are honest and free elections, that if the federal authorities, acting within their proper sphere, can in any way help to secure them, they should not omit or neglect to do so. With these general propositions before us, we come to the consideration of the principal objection raised to the indictments, to wit, that congress had no constitutional power to enact the legislation referred to; and we proceed

to its investigation, but, with the exception of one case under section 5507, without any expre , adjudications to guide us upon the exact points involved in these cases.

On July 28, 1868, the secretary of state proclaimed that the fourteenth article of amendments to the constitution of the United States had been ratified by three-fourths of the states of the Union. The first section thereof emphatically declared that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." The instantaneous effect of this was to make all the persons described in the first section citizens alike of the United States and of the states wherein they lived. It required no legislation by congress to perfect this right. The amendment itself, of its own force, achieved the object. This much being accomplished, the people went further, and the momentous result was that on March 30, 1870, by a similar proclamation, the secretary of state announced the ratification, by a like proportion of the states, of the fifteenth amendment to the constitution, which is as follows:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States, nor by any state, on account of race, color or previous condition of servitude.

"Sec. 2. The congress shall have power to enforce this article by appropriate legislation."

It will be observed that the prohibition of this amendment extends equally to the denial and to any abridgment of the right to vote on account of race, color, etc. It must be admitted that this amendment is, and was intended to be, the great charter of the negro's right to vote. It is the fountain source from whence alone it sprung, and which alone gave it vitality in many of the states. In the exercise of the powers given by these two amendments, congress passed several acts which were deemed by it appropriate; but in the cases before us we are concerned only with the provisions of the act entitled "An act to enforce the rights of citizens of the United States to vote in certain states of this Union, and for other purposes," approved May 31, 1870 (16 Stat. 140), commonly called the "Enforcement Act," as those provisions now appear in the Revised Statutes. Certain sections of this celebrated enactment have been passed upon by the supreme court. Some of them have been repealed, and some of them, though changed in form, are now sections 2004, 5507, 5508, and 5509 of the Revised Statutes. No one of these has ever been repealed or further modified. They still remain parts of the body of the laws of the United States, and are in full vigor, unless they be such enactments as are not authorized by any grant to the congress of power to pass them.

It is contended for the accused that congress has no power, under the constitution, to impose penalties upon acts done at an election held for state officers only, by which is meant an election for officers of the state, as distinguished from presidential electors and representatives in congress; and it is urged that this court has no jurisdiction in the cases before us, because it plainly appears from the indictments that, in that sense, the offenses charged were all com-

mitted at an election at which only state officers were chosen. It seems to the court that this argument proceeds upon a misapprehension alike of the statutes themselves and of the charge made against the accused. They are charged with violating the laws of the United States, and not those of the state. These laws of the United States are not intended to deal with elections at all, in any direct or proper sense,—either to regulate, control, or protect them. What the statutes which are to be construed and applied in these cases are designed to accomplish is: First, by section 5507, to prevent the denial or the abridgment of the right to vote of certain citizens (that is to say, the hindering, controlling, or preventing the exercise of the right of suffrage, by means of bribery or intimidation, on account of race, color, or previous condition of servitude); and, second, by section 5508, to punish every conspiracy to intimidate certain persons in the exercise of the right to vote on account of race, color, etc. These statutes relate, not to the election, per se, but to the denial or abridgment of the right of suffrage, as it is secured by the laws of the United States, by certain means, namely, by bribery, intimidation, etc., for certain reasons, namely, on account of race, color, etc., and for conspiracies designed to defeat that right. Article 1, § 4, of the constitution gives congress power to enact laws regulating the time, place, and manner of electing representatives in congress; and legislation may be based upon that section, in which event, of course, a statute having that purpose alone in view could only be applied when representatives were elected. But congress, under the fifteenth amendment, may also legislate to enforce and protect the rights given by that amendment, in which event the legislation may apply to any occasion when the act is committed by which the right to vote is denied or abridged on account of race, color, or previous condition of servitude. Overlooking this distinction will lead to some confusion in endeavoring to apply the decisions of the courts. The idea would at least be novel that the fifteenth amendment applied only to congressional elections.

While, as we have shown, congress may, under article 1, § 4, pass laws to regulate the election of representatives in congress, still, to limit the right of congress to that power would require a new reading of another very plainly expressed constitutional provision. The fifteenth amendment, within the scope of its purpose, is as wide as the right to vote itself. It expressly and unequivocally prohibits the denial or the abridgment of the right to vote at any election whatever—national, state, or municipal—on account of race, color, or previous condition of servitude. Its terms are general, and it is as admissible to exclude all elections from its operation as it is to exclude any. Within the limitations specified, it applies to the elective franchise,—the right to vote,—whenever, wherever, and however exercised by the people. It is apparent and undeniable that the nation itself determined to take care that no such discrimination as that provided against should be made, and it not only adopted the amendment to prohibit it, but authorized the congress to enforce the prohibition by appropriate legislation. The power of congress under a less liberal but somewhat similar provision was clearly, and we may say finally, fixed by the supreme court of the United

States when it approved the words of the great chief justice in the case of McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, presently to be noticed. As we have seen, part of this legislation remains upon the statute books. It has been there 30 years unrepealed. It has a beneficial purpose behind it, namely, the enforcement of a provision of the organic law; and the court of first instance would not be inclined to hold it invalid, does not have any predisposition to do so, and should not in any event do it, except under a strong persuasion that it certainly violated the constitution. Indeed, it may be admissible to apprehend that, if this legislation is swept away by judicial action, the entire fabric so carefully builded upon the fifteenth amendment may disappear. However, the question should be most carefully examined, because of its great importance, not only to the public generally, but to the defendants particularly. For that reason we have bestowed upon it the most painstaking consideration. We have already noticed generally the language of the statutes under which these indictments were found, and have pointed out the intention thereby at least to attempt to guard the rights of a certain class of citizens to vote without being discriminated against on account of race, color, etc., and have to some extent animadverted upon the importance of guarding the right of suffrage, and the free exercise thereof by all who are entitled to vote; and we may add that none of the provisions of any of the statutes referred to in any possible way interfere with or abridge the right of any citizen to vote as he pleases. The purpose—probably the most obvious purpose—of the legislation is to safeguard the right of citizens to the extent authorized by the fifteenth amendment. In doing this it interferes with the rights of none. It simply punishes those who unlawfully interfere with the rights of others. As we have indicated, this is, to say the least, a laudable design. The evident intention being to enforce and preserve the rights given by the fifteenth amendment, it still remains to be seen whether congress has exercised its acknowledged power in a constitutional and effective manner. The courts have had other portions of the act under consideration upon several notable occasions, the most conspicuous instances of which we will notice in somewhat chronological order:

The case of U. S. v. Cruikshank, reported in 25 Fed. Cas. 707, 1 Woods, 308, was decided by Mr. Justice Bradley, sitting in the circuit court. Much of what he said in his very strong opinion is instructive, but, as the case turned upon sections now not on the statute books, it is not so much in point as it would otherwise have been. That case, so far as it has any relevancy to these, was based upon section 4 of the act (later found, in a greatly changed form, in section 5506 of the Revised Statutes), and which has been repealed. Speaking generally, the learned justice said at page 713, 25 Fed. Cas., and page 324, 1 Woods:

"I am inclined to the opinion that congress has the power to secure that right, not only as against the unfriendly operation of state laws, but against outrage, violence, and combinations on the part of individuals, irrespective of state laws. Such was the opinion of congress itself in passing the law at a

time when many of its members were the same who had consulted upon the original form of the amendment in proposing it to the states. And as such a construction of the amendment is admissible, and the question is one at least of grave doubt, it would be assuming a great deal for the court to decide the law, to the extent indicated, to be unconstitutional."

This part of the opinion will be found very important further along. On page 715, 25 Fed. Cas., and page 329, 1 Woods, the justice also said:

"The sixth count charges a conspiracy to prevent and hinder certain citizens of the United States, who were of African descent, and persons of color, in the exercise and enjoyment of their right to vote at any election to be thereafter held in the state of Louisiana or in the parish of Grant, knowing they had such right to vote. A conspiracy to hinder a person from exercising his right to vote at any election is made indictable by the fourth section of the enforcement act; also, by the sixth section, read in connection with the first. Over the general subject of the right to vote in the states, and the regulation of said right, congress, as we have seen, has no power to legislate. The fifteenth amendment relates only to discriminations on account of race, color, and previous condition of servitude, and, as we have before shown, is a prohibition against the making of such discriminations. The law on which this count is founded is not confined to cases of discrimination above referred to. It is general and universal in its application. Such a law is not supported by the constitution. The charge contained in the count does not describe a criminal offense known to any valid and constitutional law of the United States. It should at least have been shown that the conspiracy was entered into to deprive the injured persons of their right to vote by reason of their race, color, or previous condition of servitude. This count I also regard as invalid."

It will be seen that the court held that the sixth count in the indictment, which, in general terms, charged a conspiracy to hinder certain citizens of African descent, and who were in fact persons of color, in exercising the right to vote at any election in Louisiana thereafter to be held, but which failed to show that the conspiracy was entered into to deprive the injured persons of the right to vote on account of their race or color or previous condition of servitude, was not good, so that, however wide the range of the court's observations, the real question decided was that the sixth count was insufficient in law for that reason. On a writ of error the case was taken before the supreme court, where the judgment was affirmed. From the report of the case in 92 U. S. 543, 23 L. Ed. 588, we get a somewhat clearer idea of the language of the sixth count. In passing upon it the court left no doubt about its position at that time, whether the Yarbrough and later cases indicated modifications or not. At pages 555, 556, 92 U. S., and page 592, 23 L. Ed., we find this language:

"In U. S. v. Reese, 92 U. S. 214, 23 L. Ed. 563, we hold that the fifteenth amendment has invested the citizens of the United States with a new constitutional right, which is exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude. From this it appears that the right of suffrage is not a necessary attribute of national citizenship, but that exemption from discrimination in the exercise of that right on account of race, etc., is. The right to vote in the states comes from the states, but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the constitution of the United States, but the last has been."

And on page 557, 92 U. S., and page 593, 23 L. Ed., the court continues:

"According to the view we take of these counts, the question is not whether it is enough, in general, to describe a statutory offense in the language of the statute, but whether the offense has here been described at all. The statute provides for the punishment of those who conspire 'to injure, oppress, threaten, or intimidate any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States.' These counts in the indictment charge, in substance, that the intent in this case was to hinder and prevent these citizens in the free exercise and enjoyment of 'every, each, all, and singular,' the rights granted them by the constitution, etc. There is no specification of any particular right. The language is broad enough to cover all."

It is important to bear in mind—First, that there was no charge that the acts done were done on account of the race, color, or previous condition of the injured persons; and, second, that what the court was then speaking about was not section 5 of the enforcement act, nor section 5507 of the Revised Statutes, which took its place.

At the same term at which the Cruikshank Case was decided, the court had previously passed its judgment upon the case of U. S. v. Reese, 92 U. S. 214, 23 L. Ed. 563. In that case the indictment was likewise based upon the third and fourth sections of the enforcement act, and not upon the fifth, which is now invoked by the United States. The fourth section, as originally enacted, as already shown, was commuted, with most important modifications, into section 5506 of the Revised Statutes, which was repealed by the act of February 8, 1894 (28 Stat. 36), when the sections now under consideration were not touched. Under then existing circumstances, this was quite significant. The ground upon which section 4 was held in the Reese Case to be ineffectual was (as is sufficiently shown in our extracts from the opinion in the Cruikshank Case, where they were also stated, and in a quotation from the opinion in the Reese Case, presently to be made) that it applied, in general terms, to all voters, instead of being confined to the colored man and his rights under the fifteenth amendment. For this reason, and because the court was thereby rendered unable to separate its constitutional application from its unconstitutional, the whole section was condemned. Up to this point the supreme court had never expressed itself upon what are now sections 2004, 5507, 5508, and 5509 of the Revised Statutes; but in U. S. v. Harris, 106 U. S., at page 637, 1 Sup. Ct., at page 607, and 27 L. Ed., at page 293, the court did incidentally allude to the subject of at least one of them, and said:

"The right guarantied by the fifteenth amendment is protected by other legislation of congress, namely, by sections 4 and 5 of the act of May 31, 1870, c. 114, and now embodied in sections 5506, 5507, Rev. St."

A similar observation was made by Mr. Justice Woods in his opinion in the case of Le Grand v. U. S. (C. C.) 12 Fed. 579, in which case it was held that section 5519, Rev. St., had no reference to rights guarantied by the fifteenth amendment.

The weight of these remarks is not altogether destroyed by in-

cluding in them the reference to section 5506, because the modifications of section 4 of the act of 1870, in the opinion of the court in the Fourth circuit in the case of U. S. v. Munford (C. C.) 16 Fed. 223, relieved section 5506 from the objections taken to the fourth section in the Reese Case, and at least brought the legislation within article 1, § 4, of the constitution. See, also, the very interesting remarks of Judge Hughes in the case of U. S. v. Belvin (C. C.) 46 Fed. 382.

Coming now to a consideration of what has been determined respecting the sections involved upon these demurrers, we find it different. Section 5508 is in this language:

"If two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured by the constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise upon the highway, or on the premises of another with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be punished," etc.

In Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274, the constitutionality of this section was directly adjudicated, as was that of section 5520, which was afterwards repealed. Yarbrough, having been convicted upon an indictment which charged him with violations of those sections, applied to the supreme court for a writ of habeas corpus upon the ground that those statutory provisions were unconstitutional. The writ was refused. In passing upon the question the court, through Mr. Justice Miller, said:

"The fifteenth amendment of the constitution, by its limitation on the power of the states in the exercise of their right to prescribe the qualifications of voters in their own elections, and by its limitation of the power of the United States over that subject, clearly shows that the right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the states. * * * While it is quite true, as was said by this court in U. S. v. Reese, 92 U. S. 214, 23 L. Ed. 563, that this article gives no affirmative right to the colored man to vote, and is designed primarily to prevent discrimination against him whenever the right to vote may be granted to others, it is easy to see that under some circumstances it may operate as the immediate source of a right to vote. In all cases where the former slaveholding states had not removed from their constitutions the words 'white man,' as a qualification for voting, this provision did, in effect, confer on him the right to vote, because, being paramount to the state law, and a part of the state law, it annulled the discriminating word 'white,' and thus left him in the enjoyment of the same right as white persons. And such would be the effect of any future constitutional provision of a state which should give the right of voting exclusively to white people, whether they be men or women. Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567. In such cases this fifteenth article of amendment does, proprio vigore, substantially confer on the negro the right to vote, and congress has the power to protect and enforce that right.

"In the case of U. S. v. Reese, so much relied on by counsel, this court said in regard to the fifteenth amendment that: 'It has invested the citizens of the United States with a new constitutional right, which is within the protecting power of congress. That right is an exemption from discrimination in the exercise of the elective franchise on account of race, color, or previous condition of servitude.' This new constitutional right was mainly designed for citizens of African descent. The principle, however, that the protection of the exercise of this right is within the power of congress is as necessary to the right of other citizens to vote as to the colored citizen, and to the

right to vote in general as to the right to be protected against discrimination. The exercise of the right in both instances is guarantied by the constitution, and should be kept free and pure by congressional enactments whenever that is necessary. The reference to cases in this court in which the power of congress under the first section of the fourteenth amendment has been held to relate alone to acts done under state authority can afford petitioners no aid in the present case; for, while it may be true that acts which are mere invasions of private rights, which acts have no sanction in the statutes of a state, or which are not committed by any one exercising its authority, are not within the scope of that amendment, it is quite a different matter when congress undertakes to protect the citizen in the exercise of rights conferred by the constitution of the United States, essential to the healthy organization of the government itself."

And on page 667, 110 U. S., page 160, 4 Sup. Ct., and page 279, 28 L. Ed., the court continues:

"If the recurrence of such acts as these prisoners stand convicted of are too common in one quarter of the country, and give omen of danger from lawless violence, the free use of money in elections, arising from the vast growth of recent wealth in other quarters, presents equal cause for anxiety. If the government of the United States has within its constitutional domain no authority to provide against these evils, if the very sources of power may be poisoned by corruption or controlled by violence and outrage, without legal restraint, then, indeed, is the country in danger, and its best powers, its highest purposes, the hopes which it inspires, and the love which enshrines it, are at the mercy of the combinations of those who respect no right but brute force, on the one hand, and unprincipled corruptionists, on the other."

Again, in Logan v. U. S., 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, the constitutionality of sections 5508 and 5509 was directly adjudicated. Mr. Justice Gray, after reviewing all the cases in stating the opinion of the court, and while distinguishing the facts of that case from others, on pages 293 and 294, 144 U. S., page 626, 12 Sup. Ct., and page 439, 36 L. Ed., said:

"The whole scope and effect of this series of decisions is that, while certain fundamental rights, recognized and declared, but not granted or created, in some of the amendments to the constitution, are thereby guarantied only against violation or abridgment by the United States or by the states, as the case may be, and cannot, therefore, be affirmatively enforced by congress against unlawful acts of individuals, yet that every right created by, arising under, or dependent upon the constitution of the United States may be protected and enforced by congress by such means and in such manner as congress, in the exercise of the correlative duty of protection, or of the legislative powers conferred upon it by the constitution may, in its discretion, deem most eligible and best adapted to attain the object. Among the particular rights which this court, as we have seen, has adjudged to be secured, expressly or by implication, by the constitution and laws of the United States, and to be within section 5508 of the Revised Statutes, providing for the punishment of conspiracies by individuals to oppress or injure citizens in the free exercise and enjoyment of rights so secured, are the political right of a voter to be protected from violence while exercising his right of suffrage under the laws of the United States, and the private right of a citizen, having made a homestead entry, to be protected from interference while remaining in the possession of the land for the time of occupancy which congress has enacted shall entitle him to a patent."

The section was also held constitutional in the case of In re Quarles, 158 U. S. 535, 15 Sup. Ct. 959, 39 L. Ed. 1080.

But these cases do not quite reach the exact point under consideration, however clearly they establish the general proposition

that section 5508 is constitutional. It becomes necessary, therefore, to go further. In doing so, we find that the able statesmen in congress who were endeavoring to legislate to carry into effect the fifteenth amendment framed, and congress passed, what is now section 2004 of the Revised Statutes, as follows:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any state, territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any state or territory, or by or under its authority, to the contrary notwithstanding."

We think this is appropriate legislation, that it is within the constitutional power of congress, that it is adapted to the end in view, and that it must be read in connection with section 5508.

It is urged with much zeal in respect to both indictments that the many adjudged cases which hold that the fourteenth amendment operates only as an inhibition upon the states, and not individuals, in respect to the matters therein embraced, must control the construction of the fifteenth amendment, also, upon the same grounds. The court does not yield to this view, but accepts that of Justice Bradley in passing upon the Cruikshank Case at the circuit in the language previously quoted. And in the Reese Case, 92 U. S. 218, 23 L. Ed. 565, the court, after saying that article 1, § 4, was not under consideration, used this significant language:

"It has not been contended, nor can it be, that the amendment confers authority to impose penalties for every wrongful refusal to receive the vote of a qualified elector at state elections. It is only when the wrongful refusal at such an election is because of race, color, or previous condition of servitude that congress can interfere and provide for its punishment. If, therefore, the third and fourth sections of the act are beyond that limit, they are unauthorized."

These considerations appear to us to be decisive of the demurrer in that one of the cases now before us in which the indictment is based upon section 5508. Indeed, as it cannot be doubted that the right of the colored man to vote is "secured" by the constitution of the United States, in the sense of that word as used in that section, and especially when it is construed in connection with section 2004, the question is no longer open to argument. If that right is not "secured" in that way, it rests upon no security whatever.

We now come to section 5507, upon which the other indictment is based, and which is in this language:

"Every person who prevents, hinders, controls or intimidates another from exercising or in exercising the right of suffrage, to whom that right is guaranteed by the fifteenth amendment to the constitution of the United States, by means of bribery or threats of depriving such person of employment or occupation, or of ejecting such person from a rented house, lands, or other property, or by threats of refusing to renew leases or contracts for labor, or by threats of violence to himself or family, shall be punished as provided in the preceding section."

Is this "appropriate" legislation, and within the power of congress, under section 2 of the fifteenth amendment? We think a test has been established for our guidance in reaching a conclusion

upon that question. The constitution had granted congress power to pass all laws "necessary and proper" to carry into effect the other powers given by that instrument. It will be admitted that the words "necessary and proper" are stronger than the word "appropriate," as used in the section just referred to. Yet Chief Justice Marshall said:

"We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion with respect to the means by which the powers it confers are to be carried into execution which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." McCulloch v. Maryland, 4 Wheat. 421, 4 L. Ed. 605.

Tested by this rule, we are now to determine whether congress had the constitutional power to enact this particular legislation which it deemed appropriate to enforce the amendment. Of course, it cannot be said that the decision of congress in the premises is necessarily final, and for that reason I have endeavored to find the test by which the matter was to be judged. If it is not found in 4 Wheat., 4 L. Ed., and in the cases which follow that authority, and which are collected in 1 Notes on U. S. Reports, 872 et seq., it cannot be found at all. We are clearly of opinion that the rule is applicable to this case, and that it must be followed. The plain and manifest intention of congress, as avowed and expressed in sections 2004 and 5507, was to prevent, by the means therein indicated, any abridgment of the free exercise of the right to vote guarantied by the fifteenth amendment by means of bribery, threats, or intimidation. That was the sole intention. There was no other. The end was legitimate. The purpose was within the scope of the fifteenth amendment. The means are plainly adapted to that end, and are not prohibited, but consist with the letter and spirit of that amendment.

Possibly we may get additional light upon the question by going back somewhat, and viewing it from another standpoint. Section 4 of the act of 1870, and which was considered in the Reese Case, is as follows:

"That if any person, by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, prevent, or obstruct, or shall combine and confederate with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to vote or from voting at any election as aforesaid, such person shall, for every such offense, forfeit and pay the sum of five hundred dollars to the person aggrieved thereby, to be recovered by an action on the case with full costs, and such allowances for counsel fees as the court shall deem just, and shall also for every such offense be guilty of a misdemeanor, and shall on conviction thereof be fined," etc.

In direct reference to this language the supreme court said (92 U. S. 220, 221, 23 L. Ed. 565, 566):

"But when we go beyond the third section, and read the fourth, we find there no words of limitation, or reference, even, that can be construed as manifesting any intention to confine its provisions to the terms of the fifteenth

amendment. That section has for its object the punishment of all persons who, by force, bribery, etc., hinder, delay, etc., any person from qualifying or voting. In view of all these facts, we feel compelled to say that, in our opinion, the language of the third and fourth sections does not confine their operation to unlawful discrimination on account of race, etc. If congress had the power to provide generally for the punishment of those who unlawfully interfere to prevent the exercise of the elective franchise, without regard to such discrimination, the language of these sections would be broad enough for that purpose. It remains now to consider whether a statute so general as this in its provisions can be made available for the punishment of those who may be guilty of unlawful discrimination against citizens of the United States, while exercising the elective franchise, on account of their race, etc. There is no attempt in the sections now under consideration to provide specifically for such an offense. If the case is provided for at all, it is because it comes under the general prohibition against any wrongful act or unlawful obstruction in this particular. We are therefore directly called upon to decide whether a penal statute enacted by congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which congress may rightfully prohibit and punish. For this purpose we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional, and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the constitution. The question then to be determined is whether we can introduce words of limitation into a penal statute, so as to make it specific, when, as expressed, it is general only. It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government. The courts enforce the legislative will when ascertained, if within the constitutional grant of power. Within its legitimate sphere, congress is supreme and beyond the control of the courts; but if it steps outside of its constitutional limitations, and attempts that which is beyond its reach, the courts are authorized to, and, when called upon in due course of legal proceedings, must, annul its encroachments upon the reserved power of the states and the people. To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty. We must therefore decide that congress has not as yet provided 'appropriate legislation' for the punishment of the offense charged in the indictment."

That is to say, congress has not provided for that case. It was, however, by no means intended to be said that congress had not provided for the punishment of the very different offense charged in the indictment we are now considering.

When we turn from this section to section 5507, Rev. St.; we find that it is not framed in such general terms as to include as well offenses which may be constitutionally provided against as those which may not,—the only vice which led to the condemnation of section 4 of the act of 1870. On the contrary, section 5507 is so phrased that by no possibility could any one be punished except for doing such an act as would deny or abridge the right of a colored man to vote freely as he pleased. The reason this is so is that this section is expressly limited to those to whom that right is guarantied by the fifteenth amendment. The language of this

section admits of no construction that would punish the obstructing of a white man's vote, except on the ground of race or color, in which event (though in fact it is inconceivable in our social condition) he would be as much entitled to the benefit of the fifteenth amendment as the negro is now. At all events, the whole scope of section 5507 appears plainly to be within the intent of the fifteenth amendment, and to have the purpose to make section 2004 effective. There is therefore no occasion for an attempt, as there was in reference to section 4, to separate what was within the power of congress from what was not. The effort would be vain, inasmuch as the object was single. This conclusion is inevitable when we compare the two sections in the light of what is said in 92 U. S., at page 221, and 23 L. Ed., at page 566, as copied above; and this may further indicate why the reasoning of the Yarbrough Case, and not that in the Reese Case, controls those we are now considering.

Undoubtedly the general right to vote existed long before the adoption of the fifteenth amendment, because it sprung up in the remote past with the genesis of free government by the people, but, so far as the colored man is concerned, the right not only originated, but is "guarantied," by that amendment, as that word is used in section 5507; that is to say, that amendment guaranties that that right shall not be denied or abridged on account of race, color, or previous condition of servitude. This section of the statute was intended to enforce and protect that right by appropriate legislation which may extend to punishing those who seek to deny or abridge it upon those grounds. Ex parte Yarbrough, 110 U. S. 657, 4 Sup. Ct. 152, 28 L. Ed. 274. Section 4 and other sections were held to be unconstitutional because they referred to the right of everybody to vote, and were not confined to the right as guarantied by the fifteenth amendment. The court held that congress did not have power to legislate so generally on the subject of voters and their rights. Neither the reasoning nor the decisions apply, however, to cases where, by the express provisions of the statute, the legislation is limited to cases of persons whose violated rights are guarantied by that amendment. Sections 2004 and 5507 are so limited, and they supplement one another. Indeed, it is difficult, in Kentucky, to conceive that the right of suffrage was not directly conferred upon the colored man by the fifteenth amendment, notwithstanding the statement to the contrary in the Reese Case. The difficulty, moreover, is increased when we read the language used by Mr. Justice Harlan in delivering the opinion of the court in Neal v. Delaware, 103 U. S. 388, 389, 26 L. Ed. 567, and especially when we recur to the remark of Mr. Justice Miller in the Yarbrough Case, 110 U. S. 665, 4 Sup. Ct. 159, 28 L. Ed. 278, where, in speaking of states in whose constitutions the word "white" remained, he said:

"In such cases this fifteenth article of amendment does, proprio vigore, substantially confer on the negro the right to vote, and congress has the power to protect and enforce that right."

It is incontrovertibly true that at all times prior to September, 1891, and to the constitution then adopted, the negro was excluded

by our state laws from the right to vote. From 1850 to September, 1891, the word "white" remained in that provision of the state constitution which fixed the qualifications of voters. Yet so certainly did the fifteenth amendment confer the right of suffrage upon the negro, that in Kentucky, from March, 1870, forward, he voted precisely as the white man did, in spite of the state constitution. To say the very least, the nation indirectly conferred upon the negro the right to vote, by directly and expressly forbidding that that right should be denied or abridged on account of race, color, or previous condition of servitude, and it gave congress the power to protect and guard the right thus bestowed. Congress plainly exercised that power by the legislation referred to. This was not grudgingly done by the American people or by congress. It was done as a matter of supreme national concern, and to meet what were decided to be the ends of national justice. The courts are not called upon, in the interest of wrongdoing, to fritter away by narrow or frivolous construction the safeguards of this great right so carefully bestowed. That congress, in enacting remedial criminal legislation, is not hampered by the narrow limitations contended for, is shown by what is so admirably expressed by Mr. Justice Miller in the Yarbrough Case, where, on pages 657, 658, 110 U. S., page 155, 4 Sup. Ct., and page 276, 28 L. Ed., he says:

"That a government whose essential character is republican, whose executive head and legislative body are both elective, whose most numerous and powerful branch of the legislature is elected by the people directly, has no power by appropriate laws to secure this election from the influence of violence, of corruption, and of fraud, is a proposition so startling as to arrest attention and demand the gravest consideration. If this government is anything more than a mere aggregation of delegated agents of other states and governments, each of which is superior to the general government, it must have the power to protect the elections on which its existence depends from violence and corruption. If it has not this power, it is left helpless before the two great natural and historical enemies of all republics,—open violence and insidious corruption. The proposition that it has no such power is supported by the old argument, often heard, often repeated, and in this court never assented to, that, when a question of the power of congress arises, the advocate of the power must be able to place his finger on words which expressly grant it. The brief of counsel before us, though directed to the authority of that body to pass criminal laws, uses the same language. Because there is no express power to provide for preventing violence exercised on the voter as a means of controlling his vote, no such law can be enacted. It destroys at one blow, in construing the constitution of the United States, the doctrine universally applied to all instruments of writing,—that what is implied is as much a part of the instrument as what is expressed. This principle, in its application to the constitution of the United States, more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers,—a difficulty which the instrument itself recognizes by conferring on congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted, and all other powers vested in the government, or any branch of it, by the constitution. Article 1, § 8, cl. 18. We know of no express authority to pass laws to punish theft or burglary of the treasury of the United States. Is there, therefore, no power in the congress to protect the treasury by punishing such theft and burglary? Are the mails of the United States and the money carried in them to be left to the mercy of robbers and of thieves who may handle the mail, because the constitution contains no express words of power in congress to enact laws for the punishment of those offenses? The prin-

ciple, if sound, would abolish the entire criminal jurisdiction of the courts of the United States, and the laws which confer that jurisdiction."

This demonstrates that it was in no way essential to use the words "race, color, or previous condition of servitude," in order to make section 5507 constitutional. It being obvious from the language actually employed that congress thereby meant to enforce the fifteenth amendment, the only question was, is the plan provided by this section an appropriate way to accomplish the result? That it is, at least, adapted to that end, seems clear. All that is required is that the legislation shall come within the scope of the power to enforce the amendment. It is not essential that the language of the statute shall be the same as that of the amendment. For example, the statutes of the United States make the act of robbing the mails a criminal offense. There is not a word in the constitution about such an offense. But that instrument does give congress the power to establish post offices and post roads, and it does authorize congress to pass all laws necessary and proper to carry that power into effect. Punishment for robbing the mails is indispensable to that end. But an indictment need not, in its averments, reason this out. The courts do that. U. S. v. Arjona, 120 U. S. 488, 7 Sup. Ct. 628, 30 L. Ed. 728. Other cases illustrative of this may be found in 1 Notes on U. S. Reports, 872 et seq. In attempting to enforce and protect the colored man's right to vote, it is obvious that congress was utterly powerless to pass any law that could operate upon states as such. It could only enforce the rights of voters as given by the fifteenth amendment by punishing individuals who attempt to invade, impair, or destroy it. U. S. v. Reese, 92 U. S. 218, 23 L. Ed. 563, and U. S. v. Cruikshank, 25 Fed. Cas. 713. If congress could not do this, if section 2 of the amendment does not authorize this, then that section was a vain thing, for in no other general manner could congress appropriately legislate to that end. We adopt the language of Mr. Justice Bradley on this subject in the Cruikshank Case, first quoted above, as being incontrovertibly sound. The legislation in question was designed and intended to protect the right given by the amendment, by prescribing punishments for attempts upon the part of individual persons to deny or to abridge the right to vote as guarantied by a constitutional amendment which forbade any abridgment. The purpose of the statute being such, and it being thus limited in scope, the question of its mere wisdom or efficiency was exclusively within the discretion and judgment of congress, as decided in McCulloch v. Maryland, and many succeeding cases; and there appears to be nothing in Williams v. Mississippi, 170 U. S. 213, 18 Sup. Ct. 583, which has any contrary bearing.

It is insisted, also, upon the part of the defendants, that the offenses actually charged in the indictments are not embraced by any proper construction of the statutes, because: First, the right alleged to have been injured was not one which was "secured" by any law of the United States; and, second, because the things done, and which are charged to be offenses, did not touch any right or interest of the United States, but only those of the state of Kentucky, and hence no crime was committed. A critical inspection of

the statutes and of the indictments leads to the conclusion that these objections, while plausible, are not sound. Neither the fifteenth amendment, nor the statute to enforce it, was intended, in any primary sense, to protect any interest of the United States. The great direct and fundamental object was to secure for the colored man an equal participation with the white man in the inestimable individual and personal privilege of voting and having a voice in the affairs of government, and what we have already said sufficiently indicates that our view is that the right of the colored man to vote is "secured" to him by the laws of the United States, within the sense of that word as used in section 5508. This is done by the amendment, and by section 2004, Rev. St., passed to enforce it. The court has by no means overlooked the opinion of Judge Gresham in the case of U. S. v. Amsden (D. C.) 6 Fed. 819, which held section 5507 to be unconstitutional. That case is not followed, because, in our judgment, it does not appear to have been ruled according to the views of the supreme court, either in the Yarbrough Case or in the Reese Case. Indeed, if the views of that learned judge, as there expressed, are to prevail, the fifteenth amendment is far less important, and far less adapted to the objects its framers had in view, than might have been inferred from the tremendous struggle for its adoption, and the matter had probably as well have been left with the states altogether. Opposed to what he said, it seems to us that the phrase, "to whom the right of suffrage is guaranteed by the fifteenth amendment," as used in section 5507, when properly construed, does the very thing which he thought it did not, and in the light, especially, of the Yarbrough Case, if not, indeed, of the Reese Case itself, entirely exempts that section from the criticism passed upon section 4 of the enforcement act by the court in the Reese Case. Differing from Judge Gresham, we cannot doubt that the use of the words, "to whom the right of suffrage is guaranteed by the fifteenth amendment," in section 5507, shows conclusively that the sole intention of congress was to enforce and protect the right of the colored man to vote, and clearly limits the legislation to that legitimate and constitutional end. In short, it seems to us that the general conclusions to be drawn from the authorities are: (1) That the fifteenth amendment was meant to guaranty and secure to the negro, as such, the same right to vote that the white man, as such, has; (2) that congress has the power by legislation to enforce and protect that right; (3) that any legislation having that sole object in view, if adapted to that end, if consistent with that object, and not otherwise forbidden by the constitution, is within the power of congress; and (4) that section 5507 comes within these principles, and is a valid exercise of the power of that body.

The right of the colored man to vote had its only source in, and is most certainly, in the language of Justice Gray in the Logan Case, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, "dependent upon," the fifteenth amendment, which, beyond doubt, not only created that right for him, but which at the same time gave to congress the power, and morally, at least, imposed upon it the duty, to en-

force and protect it by legislation. Sections 2004, 5507, 5508, and 5509 may not by any means be entirely adequate for the purpose; but they are all that is left, and should not be hastily swept away by the courts. The three sections, at least, which are now before us for consideration, appear to be appropriate and valid. The supreme court in several cases, as we have seen, having refused, upon the clearest principles, to declare section 5508 unconstitutional, we are not only bound by that ruling, but must decline to hold that section 5507 is void, because it seems to the court that there are, if possible, even less grounds for so holding than there might be as to section 5508. It will be observed that section 5507 fixes the penalties for the offenses therein created, by providing that they shall be the same as those "prescribed in the preceding section." As section 5506 was repealed by the act of 1894, it is contended that there is no punishment left for the offenses named in section 5507, thereby leaving the section ineffectual. It must be seen, however, that the real intention of congress in the act of 1894 was twofold, viz. (1) to repeal section 5506; and (2) not to repeal section 5507. But the contention of counsel, if sustained, must lead to a result plainly different from that evidently contemplated by congress, to wit, the repeal of one, and the emasculation of the other. The difficulty can be easily removed upon a just principle of construction which will effectuate both of the objects congress had in view, by holding that the repeal of section 5506 in no wise obliterated the record of the language used in prescribing the penalties for offenses which were no longer to be such, but left it still known and ascertainable, and in full effect, so far as it was, by reference, made a part of section 5507, and necessary for its construction and effectiveness. As to the mere penalties prescribed, section 5506 is, and always was, a part of section 5507, and to that extent and for that purpose is not repealed. The indictment under section 5508 charges that on November 7, 1899, a general election for state officers within the state of Kentucky was held under and in accordance with the laws of said state, and a poll was then and there opened, and an election was then and there legally had and held, in each voting precinct in said state, in each of which said voting precincts persons were then and there lawfully voted for by the legal voters therein for said state officers, and that at a certain named precinct certain named persons, and divers other parties to the grand jurors aforesaid unknown, were then and there, as the defendants well knew, colored men, negroes, men of African descent, and not white men, male citizens of the United States, and, as the defendants well knew, citizens and residents of said voting precinct, 21 years of age, and had been citizens and residents of said precinct for more than 60 days, and of said county in which said precinct is located for more than 6 months, and of the said state for more than 1 year, next preceding said election, and were then and there, as defendants well knew, under the laws of the United States and the laws of the state of Kentucky, legally entitled to vote for persons for said state offices; that said voters at the time and place aforesaid presented themselves with the intention and for the purpose of

voting, and demanded of the officers of said precinct permission to vote; that the defendants, knowing all of the aforesaid facts, did then and there unlawfully, knowingly, and feloniously conspire, confederate, combine, and agree together, and each of them with the other, and they and each of them with divers other parties to the grand jurors aforesaid unknown, to injure, oppress, threaten, and intimidate said voters, on account of their race, color, and previous condition of servitude, in the free exercise and enjoyment of a right and privilege which they then and there had, and which was then and there secured to them by the constitution and laws of the United States, of then and there voting for persons to fill offices at said precinct, and that in pursuance of said conspiracy, and to effect the purpose and object thereof, the defendants then and there unlawfully, willfully, corruptly, and maliciously injured, oppressed, threatened, intimidated, and prevented the said voters from voting in said precinct on said election day. It is contended that this is not good, because it does not charge, in terms, that the right injured is "the right not to be discriminated against on account of race," etc. That language, however, is the language of the courts, and not that used either in the amendment or in sections 2004 or 5508,—a fact which the contention overlooks. If such discrimination be in substance and effect charged, as we think is the case here, it is sufficient, although that word is not used in making the accusation. Construing the constitutional and statutory provisions together, the indictment seems to be good, and to charge that the accused conspired to injure certain colored men in the exercise of the right to vote, who were otherwise legally qualified to do so, on account of their race and color,—they having that right in the sense that it is "secured" to them by the amendment and section referred to,—which conspiracy is an offense against the United States, for which section 5508 fixes the penalty.

Only one thing remains to be noticed. It is urged against the indictment under section 5507 that the offense charged is mere bribery at a state election, and that the state courts alone have jurisdiction. This contention does not seem to be very material, because, while doubtless the state could also punish such an offense, it by no means follows that the national government may not do it also, in proper cases. There are many instances where the same acts are offenses against the laws both of the state and of the United States, probably the most conspicuous example of which is the offense of passing counterfeit money. Bribery at an election may be made an offense by the state, and, if that were all that had been done, this court could not enforce the law. But in attempting to enforce the fifteenth amendment, and to prevent the abridgment of the right to vote on account of race or color, congress has made it an offense against the United States to influence or control the vote of a colored man by means of bribery. Of this offense thus created, and as charged in the indictment, the federal courts alone have jurisdiction. For these reasons, it seems to the court that the demurrers and motions to quash should be overruled.